**UNITED STATES of America,**

v.

**Graciano Eduardo ZERTUCHE–TOBIAS and Edgardo Rodriguez Carrera.**

**Criminal No. H–96–181.**

United States District Court,
S.D. Texas,
Houston Division.

Dec. 3, 1996.

---

Kenneth Dies, U.S. Attorneys Office, Houston, TX, for U.S.

Joseph A. Connors, McAllen, TX, Dan B. Gerson, Houston, TX, for Graciano Eduardo Zertuche–Tobias.

Stanley G. Schneider, Schneider and McKinney, Houston, TX, for Edgardo Rodriguez Carrera.

Carlos Correa, Houston, TX, for Maria Delourdes Duran.

## MEMORANDUM AND ORDER

ATLAS, District Judge.

Pending before the Court are the Motions to Suppress of Defendants Graciano Eduardo Zertuche–Tobias ("Zertuche") and Edgardo Rodriguez Carrera ("Carrera"). The Government strenuously opposes the Motions. An evidentiary hearing was held on October 28–31, 1996, during which the Government and Zertuche called witnesses, and counsel for all parties cross-examined the witnesses extensively.[1] The Court has carefully considered all of the parties' arguments, both written and oral, as well as all other matters of record in this case and the relevant authorities. For the reasons stated herein, Carrera's **Motion to Suppress** [Doc. # 73] is **GRANTED** and Zertuche's **Motion to Suppress** [Doc. # 59] is **DENIED.**

## FINDINGS OF FACT

The Court, having considered carefully the testimony and having weighed the credibility

---

1. The Government called six witnesses in support of its position. Defendant Zertuche testified and called Dr. Antonio Barrio, Ph.D., a polygraph expert who performed a polygraph examination on Zertuche. The Court ruled orally, after a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *United States v. Posado*, 57 F.3d 428 (5th Cir.1995), and Fed.R.Evid. 104, that the polygraph report was inadmissible. In particular, the methodology utilized was inadequate to render the conclusions sought to be drawn sufficiently reliable or trustworthy to be received into evidence under Federal Rule of Evidence 702. As stated on the record, at least one of the "control" questions used by the examiner was highly inappropriate, and unreliable as a base for evaluating the other responses; the examiner did not know if the answer he assumed was untrue was in fact false. Moreover, the Government was not permitted to observe the process and virtually none of the safeguards set out in *United States v. Dominguez*, 902 F.Supp. 737, 740 (S.D.Tex.1995), were employed by Defendant to ensure and demonstrate the fairness of the process. Further, Zertuche has not convinced the Court that the results are reliable as an indicator of his veracity since Dr. Barrio spent only about three hours with Zertuche prior to the test, there may have been cultural bias in the process, and there is no proof that the polygraph results reflect anything more than Zertuche's current belief as to the events about which he was questioned.

of all witnesses, makes the following findings of fact.

***Initial Observations From Surveillance and Investigation.***—Detective Frank Fullbright, a detective with the Harris County Sheriff's Department assigned to the Harris County Organized Crime Task Force ("Task Force"), first observed Defendants on August 15, 1996, during his routine surveillance of La Quinta Inn ("Motel") on the east side of Houston. Fullbright knew, from his twelve years of narcotics investigation and police work, that the Motel was a likely spot for narcotics trafficking transactions. His assignment for the Task Force was to investigate activities at the local hotels and motels to identify individuals engaging in suspicious conduct that indicated narcotics trafficking. By use of surveillance, he had been very successful in identifying individuals and vehicles carrying narcotics, or large sums of cash that were believed to be related to narcotics transactions. He could not recall a search after this technique that had not resulted in seizure of drugs or cash.

Fullbright had commenced general surveillance at the Motel on Tuesday, August 14, and had seen a man, later identified as Mr. Navarez, check into Room 255 with a woman and child. Navarez later rented another room, Room 102, that subsequently was occupied by another man.

On the morning of Wednesday, August 15, Fullbright saw Zertuche drive slowly around the Motel parking lot and then park. Zertuche was in a 1996 black Suburban and had a passenger with him.[2] Zertuche's passenger went to Room 255 at the Motel, spoke to Navarez for a few minutes, went back down to the black Suburban, and spoke to Zertuche. Zertuche then went up and talked with Navarez for about five minutes. Thereafter, at about 11:15 a.m., Navarez visited Room 102.[3]

Meanwhile, Fullbright, through databases to which the Task Force has access, identified the black Suburban as registered to Zertuche, whom the United States Drug Enforcement Agency ("DEA") had previously encountered on two occasions and had included in two money laundering investigations. Fullbright contacted Agent William Owen of the DEA, who had personal knowledge of these prior incidents, and learned that the DEA suspected that Zertuche was involved in money laundering or narcotics transactions. In April 1992 in a Dallas airport, federal officials had seized approximately $23,000 in cash from an individual with whom Zertuche was traveling, and the currency was never claimed. In addition, in December 1995, Zertuche had visited Houston, and had traveled around the city and stayed in a hotel room with several individuals involved in narcotics dealings. Fullbright and Owen knew that the DEA had arrested Zertuche and the men he was with in December 1995, resulting in a seizure of $400,000, although Zertuche later was released without charges.[4]

Fullbright, while observing Zertuche's activities, saw a second car, a 1993 blue Suburban, driving slowly around the parking lot. The driver did not acknowledge or indicate that he knew Zertuche or the others when he first passed Zertuche's car. The driver of this vehicle, it was later learned, was Defendant Carrera.

A little while later, Zertuche and his passenger went to a Denny's Restaurant located near the Motel, and the men from Rooms 255 and 102 joined them. After eating, all four went to the rear of the Motel and talked while standing near Room 255. Carrera, driving the blue 1993 Suburban, arrived again, and this time stopped and joined the conversation. After about ten minutes, the passenger and the men from Room 255 and 102 went to Room 255. Zertuche and Carr-

---

**2.** This passenger was not definitively identified in the record.

**3.** Fullbright testified that all the people he observed throughout this investigation were Hispanic. This was only one of the various factors he cited as a basis for the conclusions he drew in his decisions in this investigation. The Court has

not considered the ethnicity of the suspects as a factor in justification of its findings or conclusions herein.

**4.** According to Owen, who was personally involved with the December 1995 arrest, Zertuche evidenced to the officers no difficulty in understanding English at the time.

era left in the black Suburban in which Zertuche had arrived.

After stopping at a Big and Tall Man's Shop nearby and apparently doing some shopping,[5] Zertuche and Carrera drove Zertuche's car to a house at 11919 Kemp Hollow, on the far west side of Houston. They put the black Suburban inside the garage and closed the door. Approximately 20–40 minutes later, Carrera left in the black Suburban.[6]

***Stop and Search of the Suburban Carrera Was Driving.***—After Carrera left the Kemp Hollow home he traveled back east on I–10, and was followed by three law enforcement officers in unmarked cars and plain clothes. The officers decided to stop Carrera to determine his identity, and to ask him questions if he agreed to answer. The officers wanted to verify that the information they had on Zertuche's black Suburban was correct. They also wanted to ask Carrera questions as part of their narcotics investigation and seek consent to search the black Suburban.

Owen, who was driving in the lane next to Carrera, turned on the police lights inside his vehicle. Owen then showed his badge and motioned to Carrera to pull over, which Carrera did. Pasadena Police Officer Dan O'Sullivan and FBI Agent Clark Webb, each in plainclothes, were in unmarked cars in front of and behind Carrera's car, respectively. They pulled over when Carrera began to stop, and parked their cars around his on the shoulder of the freeway.

Owen asked Carrera to step out of his car. Carrera did so; there is no evidence that he hesitated or was reluctant. Owen asked Carrera to move from the driver's side of the black Suburban to the front, and eventually to the passenger side.[7]

Owen, who does not speak Spanish, told Carrera in English who he was and that they were investigating a narcotics transaction. He asked Carrera for his driver's license and the registration and proof of insurance for the Suburban. As he was waiting for Carrera to retrieve his license, Owen asked Carrera where he was coming from. Carrera stated in English that he had been at a car auction. When Owen asked specifically if Carrera had been at the Kemp Hollow address, Carrera said "no." Owen stated that Carrera appeared nervous, and that Owen's suspicions were even more strongly aroused because Carrera emphatically denied that he had been at the Kemp Hollow address when Owen asked one or more follow up questions about it. Furthermore, Owen knew that Carrera's claim that he had just left an auto auction was false,[8] since he and others had followed Carrera from the Kemp Hollow house.

As Owen was talking with Carrera with Officer O'Sullivan standing by, FBI Agent Webb joined them. O'Sullivan testified that he heard Owen ask Carrera where he had

---

5. The men left the store with a few packages bearing the shop's name.

6. Carrera did not testify at the suppression hearing. Zertuche claimed that Carrera was going to a bank to make a payment on a loan. It is unclear why Carrera would have bank loan that he could repay in Houston when, according to Zertuche, he lives hundreds of miles away, in or near McAllen, Texas.

7. Carrera argues that the officers told him where to stand, implying that he was forced to follow their orders. The officers testified that they moved to a place where they could talk without fear of being injured by the freeway traffic.

8. Zertuche introduced into evidence registration cards for three different companies that sell used cars; the cards are in Carrera's name and for his use at auctions. Zertuche Exhibits 35, 36, 37. Zertuche testified that he had attended auctions at each of the three establishments on two occa-

sions, and that Carrera had been with him or had attended on other occasions. Zertuche also testified that, sometime in 1996, he had purchased five cars.

This testimony is not credible or probative as to Carrera's whereabouts on August 15, 1996. Despite Zertuche's claim that he paid cash for four cars and paid by check for one car (since he allegedly had a line of credit for his business), neither he nor Carrera submitted any documentary proof of any purchase at all, let alone any purchases on August 15. Defendants fail to persuade the Court that any car purchases ever were made, let alone made in August 1996 on the trip in issue in this case. In any event, the purchase of used cars earlier in the day would not be inconsistent with the officers' conclusion that Carrera was not forthright in his denials to Owen's questions about his visit to the Kemp Hollow residence.

been that day and where he was coming from. He corroborated Owen's testimony that Carrera stated that he just come from a car auction, and that Carrera denied having been to the Kemp Hollow residence.

According to O'Sullivan, whom the Court found particularly credible and who had the most definitive recollection of the interchange with Carrera, while Owen took Carrera's license to his car to check it on the law enforcement databases, O'Sullivan again asked Carrera, in English, for the car registration and insurance. Carrera started to go towards the vehicle to retrieve the documents. When O'Sullivan and/or Owen said they would get the papers, Carrera responded in English that they were behind the driver's side visor. The officers, believing the Suburban and Carrera were engaged in a narcotics transaction, were concerned about weapons since the vehicle had not been searched. O'Sullivan immediately stepped over to the Suburban, opened the passenger door, reached inside and across the front seat to the driver's side visor, and pulled out a small red plastic envelope.[9] Carrera stood by and did not object. Carrera did not ask O'Sullivan for the envelope, did not ask O'Sullivan to stop as he reached inside the envelope, and did not offer to pull the documents out of the envelope himself as O'Sullivan reached in and removed the envelope's contents. To O'Sullivan's surprise, the envelope contained not only the Suburban's insurance and registration cards, but also a glassine bag containing a small quantity of cocaine.

O'Sullivan did not explicitly ask permission to retrieve or look inside the plastic envelope.[10] He acknowledged that Carrera did not verbally give him permission specifically to reach into the car to get the registration and insurance papers. He stated, however, that he believed that when Carrera moved toward the car to get the papers and then told him where they were, Carrera demonstrated his consent to show the papers to the officer. O'Sullivan believed he had permission to pull the papers from the plastic envelope.

After finding the glassine bag, O'Sullivan asked what it was and Carrera initially said "nothing." O'Sullivan recognized that the bag contained cocaine.[11] Owen then gave Carrera his *Miranda*[12] warnings and placed him under arrest. Owen and O'Sullivan testified that, although no question was pending, Carrera thereafter blurted out that the cocaine was his and that he "use[d] it to stay awake when [he was] driving."

O'Sullivan and Owen then asked for Carrera's consent to search the vehicle. Carrera consented orally to the search and then executed a DEA consent form in English.[13]

9. Owen testified that he noticed a small bulge in the envelope. However, O'Sullivan, the officer who personally retrieved the envelope, did not make any such observation. Since Owen was at his own car checking Carrera's license on the law enforcement data bases for at least part of this time, he had less opportunity to observe closely the events as to the insurance and registration documents. The Court therefore does not ascribe weight to Owen's testimony in this regard.

10. The envelope was not see-through or even opaque. The contents were not visible from the outside.

11. The officers may have conducted a field test at or about this time.

12. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

13. The form, in its entirety, reads as follows:

CONSENT TO SEARCH
1. I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION TO SEARCH: (Describe the person, places or things to be searched.)
 1996 Chevrolet Suburban
 VIN 1GNEC16RXTJ320716
 Texas License
 SRV985
2. I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY.
3. I FREELY CONSENT TO THIS SEARCH.

Thereafter, Webb and Owen searched the vehicle and found $2,060 in cash in a hidden compartment between the two front seats.[14]

There is no evidence that Carrera ever asked to terminate the encounter or to leave before the officers were done checking his and the vehicle's identification. None of the officers were in uniform or had their guns drawn at any time during this stop or questioning, although Owen's firearm may have been visible since it was tucked in his waistband. There is no dispute that the only questions the officers asked were about Carrera's identity, about his previous whereabouts, about the documents as to ownership and insurance status of the car, and for permission to search the car. Finally, the evidence establishes that Carrera was given his *Miranda* warnings when the cocaine was found, and that thereafter he made the statement about his relationship to the cocaine and consented to a search of the vehicle.[15]

Although counsel for Carrera argues that Carrera does not speak English well and that he did not understand his rights or the questions or statements by the officers, there is no evidence to support this contention. The officers all testified that they spoke only English to Carrera and that he answered their questions appropriately in English.[16]

After the search of the car was completed, Carrera was taken to a location near the Kemp Hollow house.

***Search of the Kemp Hollow Residence.***— Fullbright had concluded, prior to the stop and arrest of Carrera, that there was insufficient information to constitute probable cause to search the Kemp Hollow residence. He, in conjunction with several DEA agents and others on the Task Force, decided that they would use a technique known as "knock and talk," whereby agents with at least one uniformed police officer knock on the front door of a residence, introduce themselves as law enforcement officers, and ask permission to question the occupants about matters under investigation. Fullbright testified that he has almost never been refused by individuals when using this technique.

After Owen returned to the residence with Carrera, he joined Fullbright, DEA Agent David Downing and several other law enforcement officers who were assigned to the Task Force. It was decided that DEA Agents Owen and Downing and a uniformed police officer, J.J. Miller, would approach the residence.[17] These three officers went to the front door of the Kemp Hollow residence, which was recessed a few feet from the front wall of the house. While they stood on the front stoop, Agent Downing knocked several times on the front door. As demonstrated by Downing in court, the knocking was firm and loud enough to be heard, but not threatening. Zertuche told Maria Delourdes Du-

---

| | |
| --- | --- |
| ___8/15/96___ | /s/ Edgardo Carrera |
| Date | Signature |
| Witnesses: | ___/s/ Bill Owen S/A 2:40 PM___ |
| | /s/ Clark D. Webb, SA FBI Houston, Tx. |
| | 2:40 PM 8/15/96 |

Government Exhibit 1.

14. While Owen's testimony was somewhat inconsistent as to whether some of his questioning of Carrera (about where Carrera had come from) was done before or after the cocaine was found by O'Sullivan and *Miranda* warnings were given, O'Sullivan's testimony was clear as to the sequence. The Court credits O'Sullivan's testimony on this and other significant points. Since Carrera did not testify, there is no material conflict in the evidence about the stop, the questioning and the search of Zertuche's car.

15. Carrera argues that O'Sullivan and Owen admitted at the hearing that, once Carrera stopped and got out of his car, he was not free to leave until the questioning about the insurance and registration was completed.

16. Zertuche stated that Carrera was more proficient in English than he, and that Carrera came with Zertuche to Houston on business to assist Zertuche because of Carrera's ability to speak English. Moreover, the three used car auctions for which Carrera had identification cards were conducted in English. *See* Zertuche Exhibits 35, 36 and 37.

17. Agents Owen and Downing were wearing a black "raid jackets" with large yellow letters spelling "POLICE."

ran [18] in English to open the door and she did so. Downing introduced himself and the others as "police officers" and asked if there was anyone in the residence. As Duran began to answer in the affirmative, Downing and Owen saw Zertuche, who was seated a few feet away in the living room on a couch placed against a low partition between the living room and front hall.[19] As Downing was asking Duran if she and Zertuche could step outside, he and Owen saw Zertuche reach down toward the front of the couch, to a place out of the officers' view. Since the officers feared that Zertuche was reaching for a weapon located on the floor or under the couch, Owen and Downing told Zertuche in English to raise his hands where the officers could see them and to step outside. Zertuche complied and came to the door without shoes. He and Duran came outside to the front stoop and met with the officers. Neither Zertuche nor Duran expressed any reluctance or resisted any of the officers' requests.

While standing outside the front of the residence,[20] Downing, who testified that he speaks virtually no Spanish, explained that they were officers of the Drug Enforcement Agency and asked who lived there. Duran responded that she was not the owner of the house but that she lived there. Zertuche explained in English that he "leased" or "rented" the residence. Downing asked Zertuche if they could search the house, and Zertuche agreed orally.[21] Downing then said that he needed to get the consent in writing. Downing filled out the address of the Kemp Hollow residence as he read the DEA Consent Form, which is written in English, aloud to Zertuche. Downing then asked Zertuche to sign the form and Zertuche did so. *See* Government Exhibit 2.[22]

There is no evidence that Downing or anyone else threatened or made any promises to Zertuche in the course of their discussion.[23] Downing observed that Zertuche appeared to want to cooperate and that he did not communicate by body language or in words that he was afraid of the officers. At the time Zertuche consented to the search, there were approximately five officers in his view.[24] There were no marked police patrol cars in front of the house, although there may have been one or two patrol cars visible two houses down the street.[25]

18. Duran has pleaded guilty in this case. She is now a fugitive, and thus she was not called as a witness at the suppression hearing.

19. This partition was about four feet high on the left side of the foyer, starting approximately a "foot or two" inside the front door. *See* Zertuche Exhibit 16 (photograph of living room, with partition on far left).

20. Zertuche places his meeting with Downing and Owen a few feet to the east of the front door, while the officers testified that they were directly in front of the entry way. This difference is not material.

21. Zertuche's testimony on this exchange does not differ substantially. To the extent his version is inconsistent, the Court does not credit Zertuche's testimony.

22. The Consent Form used for the residence is identical to the one used by the officers who searched the Suburban driven by Carrera. *See supra* note 13 (text of the Consent Form). The form identifies "11919 Kemphollow Dr. Houston, Tx" as the place to be searched, and is signed and dated by Zertuche and two agents.

23. Zertuche claims that an agent whose name he did not know, ultimately identified as FBI Agent Robert Boudreau, asked in English, "Weapons, fat man? Weapons, son?" and "Remember me?" The Court finds that if this was said, it was after Zertuche had given the officers consent orally to search the house, and may have been after the Consent Form was signed. The Court notes that this testimony reinforces the conclusion that Zertuche in fact speaks or at least comprehends English.

24. Zertuche could see the three officers at the front door, in addition to Fullbright, DEA Agent Robert Boudreau, and possibly one other officer. Police Officer Maurice Gartman and Sheriff's Deputy William Tipps, both of whom were assigned to the Task Force, were at the rear of the home and were not visible to Zertuche at the time Downing and Owen were asking him about consent for the search. Police Officer Lawrence Stewart was down the street but could not see the front door of the residence. Officer Miguel Gonzalez came to the scene later, after the arrests had been made.

25. Zertuche testified that he believed he was being "detained," that he could not leave, and that he saw eight or nine officers in the area when he was talking to Downing. He stated that he signed because he believed that the officers "could search anyway."

Owen stated during cross-examination that Downing told Zertuche that he could refuse to consent.[26] The Court finds that there was at least some cursory statement to Zertuche that he could refuse the officers' request for the consent to search.

Shortly after Zertuche signed the consent, while conducting the protective sweep to be sure no additional people or weapons were in the house, the officers asked Zertuche if there were any weapons, narcotics or money in the house. Zertuche told them at that time that there were two guns and some cocaine in a closet, although he did not identify a specific closet.

The officers then entered the house and conducted a more detailed search. During the search, they found 19 kilos of cocaine in the walk-in closet in the master bedroom closet. None of the law enforcement witnesses had personal knowledge of exactly how or when the 19 kilos of cocaine were found.[27] Fullbright explained that he was not present when an officer first discovered the packages in a closet, but he was called over and saw the 19 kilos in a cardboard box on the floor of the master bedroom closet. He recognized the contents as cocaine from their appearance and because he smelled the drug through the cellophane wrapping.[28] During the search, Sheriff's Deputy Tipps found another kilo package of cocaine buried between two cushions in the living room couch on which Zertuche was sitting when Duran first opened the front door.[29] The officers also found smaller quantities of cocaine in the carpet where apparently Zertuche had placed it after he was arrested by the officers, several packages of cocaine in a woman's pair of pants and a shirt, and a small packet of cocaine on the entertainment center in the living room. The officers found, in various places near the kitchen and in the living room, approximately $119,400 in cash wrapped in opaque plastic. They found approximately $2,000–$3,000 in unwrapped cash, apparently consisting of $5–bills rubber-banded together, on a table in the master bedroom, with a set of keys to a BMW and a wallet that belonged to Zertuche.[30] The officers also found a loaded .45 pistol and an AK–47 assault rifle in the master bedroom.[31]

As soon as the officers found the cocaine, Zertuche and Duran were placed under arrest. The agents informed the suspects of their rights in English, and also called for a Spanish-speaking police officer. Officer Gonzalez, who arrived while the search of the house continued informed Zertuche, Carrera and Duran of their *Miranda* rights in Spanish.

All conversation between Zertuche and the investigating officers was in English, including the questioning about the consent. The officers had no doubt that Zertuche understood the questions he was being asked, because the questions were simple and Zertuche's responses were given in English and were completely appropriate. There is no dispute that the officers did not speak Spanish to Zertuche or Duran. Nor is there any evidence that Zertuche or Duran ever said they did not understand what was being said or asked by the officers.[32] To the contrary, there is credible testimony from Owen that later, on the way to the police station, Zertuche asked Owen in broken but understandable English how long he would be in jail and how long the agents had been following him. Zertuche then stated, "I am not a good traf-

---

**26.** Downing did not mention this in his testimony.

**27.** There was some evidence that Zertuche led the agents to the closet and identified the location of the cocaine. Other evidence indicated that the cocaine was found and Zertuche was then taken to see it. All the evidence is hearsay and lacks any reliability. The Court in making these findings and conclusions does not rely on any of the officers' testimony in this regard.

**28.** *See* Zertuche Exhibits 19, 20 and 21.

**29.** This package was opened, as if it had been sampled, which is consistent with Zertuche's testimony.

**30.** *See* Zertuche Exhibit 27.

**31.** *See* Zertuche Exhibits 21, 25A.

**32.** Zertuche could have stated at any time that he did not understand what was being said or what he was being asked. Zertuche thus could have avoided giving consent, or at least postponed it, while he thought about what he wanted to do.

ficker because I always get caught." He also talked to the agent about his children.

***Zertuche's Testimony.***—Zertuche testified in his own behalf, using a Spanish interpreter. Zertuche testified that he frequently visited Duran in Houston, and that he gave Duran cash for her apartment and, later, the house rental payments. Presumably, this testimony was to establish his authority to consent, and thus his standing to challenge the consent, to the search of the house.

Zertuche testified extensively as to the details of the transaction that gives rise to the indictment in this case. He also testified extensively on matters surrounding his alleged receipt of $23,000 in April 1992, which was seized by federal officials in the Dallas airport when Zertuche and his friend were traveling back to their residence in the Valley. Finally, Zertuche testified to some extent about welding and auto parts businesses he claimed to have.[33] The Court makes the following findings as to Zertuche's testimony.

Zertuche's denial of any ability to speak the English language is not credible. Zertuche, was born in Mexico, near the Texas border, and was a frequent visitor to the United States with his parents from the time he was six years old. As a teenager and adult, he visited the United States to shop, visit friends, and for other purposes. He stated that while he was growing up he made trips of one day or longer to Texas at least twelve or fifteen times a year. Zertuche attended three years of college in Mexico, during which time he apparently studied law.[34] He moved to Brownsville and has lived there with his wife, who is a United States citizen, since 1988. They have two children, one of whom is school age. Incredibly, he claimed that he has never heard his six year old, who attends school in McAllen, speak any English.

The Court has no doubt that, although Zertuche's ability to speak English may be somewhat limited, he was able to understand the officers' questions and was able to make the responses he intended. On several occasions during Zertuche's testimony he accidentally used English phrases. Moreover, he testified that he understood the contents of the Consent Form, and that—despite all the officers speaking only English—he was sure that he had not been told that he was free to leave or to refuse to consent to the search that Downing was requesting. In any event, Zertuche certainly had the ability to tell the officers, in English or Spanish, that he did not understand their questions, if in fact that was the case.

The Court does not credit Zertuche's testimony as to the circumstances of his receipt of $23,000 and the existence of any welding business.[35] The Court also does not credit Zertuche's testimony that he had a viable used auto parts business.[36]

33. Zertuche invoked his Fifth Amendment right against self-incrimination in connection with the details of his involvement in the December 1995 transaction that led to the $400,000 seizure. He also claimed the Fifth Amendment as to his income from his purported auto parts and welding businesses, after stating that he had not filed tax returns for several years. Finally, after testifying repeatedly on direct examination that he had visited Duran frequently in Houston and been to Houston often in furtherance of his used auto parts business, he invoked the Fifth Amendment on cross-examination as to how often, when and why he came to Houston other than two times he claimed were related to his auto parts business.

34. At Zertuche's detention hearing, evidence was introduced that he had three years of legal training in Mexico. This finding is supported by the report from Pre–Trial Services.

35. Zertuche testified that, in April 1992, he was given $23,000 by a friend's parents in Mexico to start a welding business, and that he and his friend had taken the money, all in cash, to Dallas to buy welding equipment. He admitted they had no specific prospects for equipment located in Dallas; he claimed that he and his friend paid cash for their plane tickets and went to try to find some equipment they liked. They were unsuccessful and were headed back to the Valley, with the cash stuffed in Zertuche's friend's pockets, when the currency was seized. Zertuche could not explain why neither he, his friend, nor his friend's parents had claimed the money, or why neither the friend nor his parents wanted Zertuche to repay it. No documents concerning Zertuche having or doing any welding business were introduced. There is no credible evidence that any welding business exists or ever existed.

36. Zertuche produced no documentary evidence of any such business in his own name. Indeed, the only documents he introduced in evidence are the identification cards in Carrera's name bearing the company name "E–Z Used Auto Parts." He testified that until at least early 1996,

As to Zertuche's connection to the Kemp Hollow residence, Zertuche claims that he paid many of the bills for Duran to live there.[37] On direct examination, while Zertuche was seeking to establish his standing to challenge the consent to search the residence, he claimed that he visited Houston and Duran "frequently," which he defined as at least once a month. He stated that he stayed at the house on "numerous occasions" and that he came "very often to Houston" to buy cars. He claimed that he paid the expenses for the Kemp Hollow residence so he would not have to rent hotel rooms when he came to Houston "frequently." Zertuche had a key to Duran's residence, which he used sometimes when he visited. He did not always tell Duran when he was coming, but sometimes called her in advance if he did not have the key. He stayed in the house on at least several occasions, although since his testimony is grossly inconsistent on this point, the number of times is not clear.[38]

Zertuche elected to testify about the events connected to the drugs and money to which the instant suppression motion is directed. The Court finds only the following portions of his testimony credible. On or about August 11 or 12, 1996, Zertuche was asked by Ruben Herrera and Arnoldo Garza, who live in Reynosa, Mexico, to take 20 kilos of cocaine to Houston and to find a buyer for it. Zertuche agreed.[39] Zertuche was provided the blue Suburban by their associate to transport the narcotics from McAllen. Zertuche and Carrera[40] arrived in Houston with the narcotics very early on the morning of August 14. They went to Duran's house on Kemp Hollow, put the car in her garage, and placed the 20 kilos of cocaine in the master bedroom closet.[41]

Zertuche and the officers' accounts of the encounter at the Kemp Hollow residence on August 15 differ dramatically as to how Zertuche initially got involved in the encounter. Zertuche claims that after the officers

the business was operated from his home in Brownsville. There was no documentary or other evidence, besides Zertuche's own testimony, that the company has anything to do with him or is in fact a legitimate business.

37. Zertuche paid the deposit and first month's rent on the house, as well as contributing to the rent for the summer months of 1996. He purchased the living room furniture, contributed to the cost of the bedroom furniture, and stored a few clothes at the house. Zertuche and Duran had had an affair for at least four years, starting when she resided in Brownsville and continuing after she moved to Houston.

38. Interestingly, after having been questioned in detail on various matters during cross-examination, Zertuche reduced dramatically the number of times he could remember actually having been to Houston. He then began to assert his Fifth Amendment privilege against self-incrimination in regard to this topic.

39. Zertuche, on direct examination, suggested that he was a mere courier and that he would receive only $300 per kilo from Herrera and Garza. The Court does not credit the testimony as to his limited role. Zertuche, on cross-examination, admitted that he was to find a buyer and claimed that he did so through Duran. He testified that he planned to sell the cocaine for $14,-000 per kilo ($280,000) to Duran's brother-in-law, who was from Colombia. Zertuche stated that he expected Duran to receive $1,000 per kilo from the sale, and indicated he would get a portion of that money. Zertuche acknowledged

that the proposed buyer, Duran's brother-in-law, was someone he did not know (indeed, had never met, despite his longstanding relationship with Duran) and had not talked to about the transaction before bringing the drugs to Houston. He had no explanation for what he planned to do if this individual did not want the drugs or was not willing to pay the price Garza wanted. He also testified that he had made no efforts to contact the proposed buyer during the two days he had been in Houston, let alone prior to his arrival. The Court therefore finds that Zertuche's testimony that he was a mere courier is not credible.

40. Carrera's role is unclear. At a minimum, according to Zertuche, Carrera learned about the narcotics while he and Zertuche drove to Houston. Other testimony and evidence indicate that Carrera helped Zertuche in his auto parts business. *See e.g.*, Zertuche Exhibit 35, 36 and 37.

41. Zertuche did not testify about or even attempt to explain most of his meetings at the Motel or at Denny's Restaurant before he went to the Kemp Hollow house on the afternoon of August 15. Zertuche states that he "ran into" his friend from the Valley, Reynoldo Gonzalez, in Houston on August 14 or 15, and his friend wanted Zertuche to purchase a used car for him. The Court finds this story farfetched, at best, and incredible. Zertuche did not provide any documentary or corroborating evidence for it. Moreover, there was no testimony as to the identity of the passenger in Zertuche's car when he arrived at the Motel.

knocked on the door and Duran opened it, they barged in with guns drawn, pointed the guns at him at close range, yelled excitedly for him to put his hands up, and pushed Duran against the wall. Zertuche testified that the officers then ordered Duran and him out of the house. The inconsistencies of Zertuche's testimony generally,[42] and some of the inconsistencies as to his version of the events prior to his consenting to the search of the house,[43] lead this Court to credit the officers, rather than Zertuche's, rendition of these events. Therefore, the Court finds, as the officers all testified, that they did *not* enter the house without permission at any time.

By all accounts, once Zertuche began to talk with the officers, he was fully cooperative. Zertuche did not take any action or give the officers any indication that he objected to their inquiries or to the search. He did not ask the officers to leave the premises, did not verbally try to end the interview, and did not attempt to go inside and thus indicate he wanted to end the encounter. He never stated that he objected to any search, that he did not understand the officers' questions, or that he did not want to sign the consent form.

**42.** Some examples of the inconsistencies in Zertuche's testimony are as follows: wide inconsistencies as to the number of times he previously had visited Houston prior to the August 14–15, 1996 trip; nearly total absence of documentation to support the existence of a legitimate welding business, used auto parts business, or used car business; inability to produce evidence of any personal dealings with the used auto part auction houses, such as cards with his own name and photograph or receipts for any car or parts purchases; his consistent use of cash in his business despite the alleged existence of business loans; inconsistencies as to the cars he owns and drives (an out-of-service BMW, a borrowed blue Suburban and a black Suburban mysteriously in Houston, in addition to different cars involved in the events surrounding the $400,000 seizure); inconsistencies as to details of his dealings with the Mexican and Houston individuals who were his alleged source of the 20 kilos of cocaine (such as his failure to make advance arrangements with Duran or her brother-in-law, although he planned to stay with Duran and anticipated that her brother-in-law would buy the drugs); the patent lack of logic in connection with the cash in the Kemp Hollow residence and the alleged plan to dispose of the narcotics, in that all the drugs were still in Zertuche's possession although Duran and he allegedly had received a

Zertuche does not deny that he told the officers that there were guns and narcotics in the house. He argues instead that he should not have been asked the question.

## DISCUSSION

### I. ESTABLISHED LEGAL PRINCIPLES

#### A. General Principles

The touchstone of the Fourth Amendment is reasonableness. *See Ohio v. Robinette,* —— U.S. ——, ——, 117 S.Ct. 417, 420–21, 136 L.Ed.2d 347 (1996); *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Robinette,* —— U.S. at ——, 117 S.Ct. at 421. The Supreme Court and Fifth Circuit have long held that "warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Ho,* 94 F.3d 932, 935 (5th Cir.1996) (citing *United States v. Cardenas,* 9 F.3d 1139, 1147 (5th Cir.1993), *cert. denied,* 511 U.S. 1134, 114 S.Ct. 2150, 128 L.Ed.2d 876 (1994)).[44] In

43% or $120,000 "down payment" for them; his feigned inability to speak English despite the frequency with which he came to the United States as a child and teenager, his marriage to a United States citizen with a school-age child, and the dealings he would need to conduct his purported businesses; his initial inability to select from the photographs in evidence the articles of clothing that were his own; and his failure to bring virtually any corroborating evidence for any of the explanations he proffered.

**43.** Zertuche claims, for instance, to have used the cocaine one and a half hours before the agents knocked on the door, but at about that time he was with Carrera at the Big and Tall Men's Shop or in transit from there. Zertuche also was inconsistent in his testimony as to which officers allegedly raced into the house, what they looked like, or what they did to him. For further inconsistencies, *see supra* note 39.

**44.** In determining whether or not a seizure has occurred for purposes of the Fourth Amendment, the Court must examine, in light of the totality of the circumstances whether or not a reasonable person would have believed he or she was free to leave or to refuse to consent to the search the officers have requested. *See Florida v. Bostick,*

general, any restraint on a person amounting to a Fourth Amendment seizure is invalid unless justified by probable cause. *United States v. Cooper*, 43 F.3d 140, 145 (5th Cir. 1995). However, certain limited investigative stops are justifiable if "there is an articulable suspicion that a person has committed or is about to commit a crime." *Id.*; *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Warrantless searches also are permissible when police receive voluntary consent to search by a person able to give such consent. *Id.*

■ There are thus three general types of encounters between police and individuals: First, there is a "consensual encounter," which may be initiated by police without any objective level of suspicion, in which the individual willingly agrees to speak to police. Without more, a consensual encounter does not amount to a Fourth Amendment "seizure." *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 435, 111 S.Ct. 2382, 2386–87, 115 L.Ed.2d 389 (1991)). Second, there is a "limited investigative stop," permissible under *Terry v. Ohio* if there is a "reasonable suspicion" that a person has committed or is about to commit a crime. *Id.* Third, there is an arrest, which must be based upon probable cause and justifies a "warrantless full-blown body search." *Id.*

The courts have recognized that there is an "acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. 'Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973) (citing *Haynes v. Washington*, 373 U.S. 503, 515, 83 S.Ct. 1336,

1344, 10 L.Ed.2d 513 (1963); *Culombe v. Connecticut*, 367 U.S. 568, 578–80, 81 S.Ct. 1860, 1865–67, 6 L.Ed.2d 1037 (1961)).

■ Where as here, there was no warrant for any of the "seizures" of Defendants—the searches or the arrests—the Government has the burden to justify the warrantless searches. *United States v. Roch*, 5 F.3d 894, 897 (5th Cir.1993); *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir.1990). The Government has the burden at suppression hearings to prove, by a preponderance of the evidence, the voluntariness of a consent to a warrantless search, the voluntariness of a confession, the inevitable discovery of evidence, or the waiver of *Miranda* rights. *Hurtado*, 905 F.2d at 76 (collecting cases).

In this case, the Government seeks to justify the stopping, questioning, and searches under *Terry v. Ohio* and Defendants' consent. Both of these therefore will be addressed in turn.[45]

### B. *Investigative or "Terry" Stop*

An investigative stop pursuant to *Terry v. Ohio* requires that the officer have "reasonable suspicion," a standard which is "considerably easier for the Government to establish than probable cause." *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir.1993), *cert. denied*, 511 U.S. 1060, 114 S.Ct. 1630, 128 L.Ed.2d 354 (1994) (citing *United States v. Wangler*, 987 F.2d 228, 230 (5th Cir.1993)). To satisfy the "reasonable suspicion" standard, the officer "must be able to point to *specific* and *articulable* facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880 (emphasis added). *Accord United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Delaware v. Prouse*, 440 U.S. 648,

---

501 U.S. 429, 437, 111 S.Ct. 2382, 2387–88, 115 L.Ed.2d 389 (1991); *United States v. Gonzales*, 79 F.3d 413, 420 (5th Cir.), *cert. denied*, — U.S. ——, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996). The test is an objective one that looks to the police officer's conduct at issue and the setting in which it occurs. *Michigan v. Chesternut*, 486 U.S. 567, 573–74, 108 S.Ct. 1975, 1979–80, 100 L.Ed.2d 565 (1988). This objective analysis, focusing on the officers and the setting, allows the law enforcement officers to determine in ad-

vance whether their contemplated conduct will violate the Fourth Amendment. *Id.* Furthermore, the "reasonable person" test presupposes an *innocent* person. *Bostick*, 501 U.S. at 438, 111 S.Ct. at 2388.

**45.** The Government half-heartedly argues in its Memorandum that there was probable cause to search the car Carrera was driving. This argument also will be briefly addressed.

653–55, 99 S.Ct. 1391, 1395–97, 59 L.Ed.2d 660 (1979).

▆▆▆ As the Fifth Circuit has explained, "[t]he prosecution must demonstrate a 'minimal level of objective justification for the officer's actions, measured in light of the totality of the circumstances.'" *Tellez,* 11 F.3d at 532 (quoting *Wangler,* 987 F.2d at 230).[46] When considered together, several otherwise innocent activities may "amount to reasonable suspicion." *Sokolow,* 490 U.S. at 9, 109 S.Ct. at 1586–87 (1989); *United States v. Chavez–Villarreal,* 3 F.3d 124, 126–27 (5th Cir.1993) ("[w]e assess the basis for a stop not by isolating any component factor, each of which may indicate wholly innocent behavior standing alone, but by examining the entire picture, which must yield articulable and objective manifestations of particularized suspicion"). A court may consider the investigating agents' law enforcement experience, particularly with reference to the specific type of crime involved in the case before the court. *See, e.g., Gonzales,* 79 F.3d at 422.

▆▆▆ A *Terry* stop, since it is not grounded on probable cause, warrants a temporary seizure only "for the purpose of questioning limited to the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion) (citing *United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975)). A search incident to a *Terry* stop is permissible only to the limited extent required to determine if a suspect is armed or can reach a weapon that might be used to harm an investigating officer. *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). *Id.*[47]

### C. *Consent*

Warrantless searches are permissible when voluntary consent is given by a person able to furnish such consent. *United States v. Jenkins,* 46 F.3d 447, 451 (5th Cir.1995). Law enforcement officers may approach an individual on the street or in another public place by inquiring whether the individual is willing to answer some questions, or by asking questions if the person is willing to listen. *Royer,* 460 U.S. at 497, 103 S.Ct. at 1323–24. The crucial test as to voluntariness has always been "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick,* 501 U.S. at 437, 111 S.Ct. at 2387 (quoting *Chesternut,* 486 U.S. at 569, 108 S.Ct. at 1977); *Gonzales,* 79 F.3d at 420.

▆▆▆ The Government must demonstrate that a defendant's consent was not the product of coercion or duress, express or implied, but was a voluntary waiver of his or her Fourth Amendment rights. *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59. This waiver does not need to be knowing and intelligent. *Id.* at 241, 93 S.Ct. at 2055. However, for constitutional purposes, nonresistance may not be equated with consent. *United States v. Cooper,* 43 F.3d 140, 145 n. 2 (5th Cir.1995).

▆▆▆ The Fifth Circuit has enumerated six factors relevant to whether a consent to search was voluntary or was the product of coercion, express or implied:

1. the voluntariness of defendant's custodial status;

2. the presence of coercive police procedures or physical punishment;[48]

3. the extent and level of the defendant's cooperation with the police;

---

**46.** Reasonable suspicion "need not be based merely on personal observation," but can be based upon other information with sufficient "indicia of reliability." *Tellez,* 11 F.3d at 532; *Wangler,* 987 F.2d at 230.

**47.** Detentions that are "investigative" may nevertheless violate the Fourth Amendment absent probable cause, and reasonable suspicion sufficient to justify a *Terry* stop is "insufficient to justify custodial interrogation even though the

interrogation is investigative." *Id.* at 499, 103 S.Ct. at 1325. However, "an officer's use of some force does not necessarily cause an encounter to exceed the scope of *Terry.*" *Tellez,* 11 F.3d at 533.

**48.** The Court should take account of subtly coercive police questions as well as the possibly vulnerable subjective state of the person who consents. *See Schneckloth,* 412 U.S. at 229, 93 S.Ct. at 2048–49.

4. the defendant's awareness of his right to refuse to consent, and whether the defendant was informed of this right;[49]

5. the defendant's education and intelligence;[50] and,

6. the defendant's belief that no incriminating evidence would be found.

*Jenkins,* 46 F.3d at 451. " '[A]lthough all of the above factors are highly relevant, no one of the six factors is dispositive or controlling of the voluntariness issue.' " *Id.* (quoting *United States v. Olivier–Becerril,* 861 F.2d 424, 426 (5th Cir.1988)) (citations omitted). Indeed, the court is to examine "the totality of the circumstances." *United States v. Broussard,* 80 F.3d 1025, 1036 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 264, 136 L.Ed.2d 189 (1996).

 Consents and statements given *during* a period of illegal detention are inadmissible even if voluntarily given, if the consent or statements are the product of the illegal detention and not the result of an independent act of free will. *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326. Although a "voluntary consent can validate a search even when the consent to search is preceded by a Fourth Amendment violation," the Government then "has a heavier burden of proving consent." *United States v. Kelley,* 981 F.2d 1464, 1470 (5th Cir.), *cert. denied,* 508 U.S. 944, 113 S.Ct. 2427, 124 L.Ed.2d 647 (1993).

 A consent waiving Fourth Amendment rights may be limited, qualified, or withdrawn. *Ho,* 94 F.3d at 936 n. 5. The "standard for measuring the scope of a suspect's consent . . . is that of objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *U.S. v. McSween,* 53 F.3d 684, 687 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. ·199, 133 L.Ed.2d 133 (1995) (quoting *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803–04 (internal quotation marks omitted)). Furthermore, "the 'scope of a search is generally defined by its expressed object.' " *McSween,* 53 F.3d at 688 (quoting *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803–04).

### D. *Probable Cause*

As noted previously, the Government makes a half-hearted argument that there was probable cause to search the vehicle Carrera was driving.

 Where police have probable cause to believe that a crime has occurred, warrantless search of an automobile is permissible under the Fourth Amendment. *Ornelas v. United States,* —— U.S. ——, ——, 116 S.Ct. 1657, 1660, 134 L.Ed.2d 911 (1996); *Ho,* 94 F.3d at 932 (citing *United States v. Barlow,* 17 F.3d 85, 89 (5th Cir.), *cert. denied,* 513 U.S. 850, 115 S.Ct. 148, 130 L.Ed.2d 88 (1994)); *United States v. Wadley,* 59 F.3d 510, 512 (5th Cir.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996)).[51] Probable cause is determined by an objective test, and " 'cannot be established

---

**49.** To the extent Defendants argue that the Constitution requires that a lawfully seized defendant be told he is free to leave before his consent to the police's request to search or to question is recognized as voluntary, this Court is bound by the Supreme Court's consistent refusal to require such an affirmative statement by the officers. *See Robinette,* —— U.S. ——, 117 S.Ct. 417, 136 L.Ed.2d 347; *Chesternut,* 486 U.S. at 574, 108 S.Ct. at 1979–80. Moreover, proof that the suspect had *knowledge* of a right to refuse is not required for effective consent to a search. *Schneckloth,* 412 U.S. at 231, 248–49, 93 S.Ct. at 2049–50, 2058–59; *Gonzales,* 79 F.3d at 421 (while government did not inform defendants that they need not consent, "there is no absolute requirement that the government establish that [defendants] knew they could refuse; it is merely one of the factors").

**50.** Under its traditional definition, "voluntariness" takes into account evidence of "minimal schooling" and "low intelligence." *Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2058–59. *See also United States v. Mendenhall,* 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980); *Tukes v. Dugger,* 911 F.2d 508, 517–18 (11th Cir.1990), *cert. denied,* 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 225 (1991) (defendant's low level of education and intelligence did not void consent).

**51.** *See also United States v. Sinisterra,* 77 F.3d 101, 104 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 82, 136 L.Ed.2d 39 (1996) (automobile exception to search warrant requirement when vehicle is " 'readily capable' of 'being used on the highways' and it 'is found stationary in a place not regularly used for residential purposes . . .' ") (quoting *California v. Carney,* 471 U.S. 386, 392, 105 S.Ct. 2066, 2070, 85 L.Ed.2d 406 (1985)).

simply by showing that the police subjectively believed that probable cause existed.'" *Ho,* 94 F.3d at 932 (quoting *United States v. Cooper,* 949 F.2d 737, 744 (5th Cir.1991), *cert. denied,* 504 U.S. 975, 112 S.Ct. 2945, 119 L.Ed.2d 569 (1992)).

> Probable cause for a warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of the arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense. Although probable cause requires more than a bare suspicion of wrongdoing, it requires substantially less evidence than that sufficient to support a conviction.

*Id.* at 935–36 (internal quotation marks and citations omitted).

## II. OFFICERS' STOP OF CARRERA AND SEARCH OF THE SUBURBAN

Defendant Carrera argues that (1) the officers "did not have reasonable suspicion to conclude that Defendant was involved in criminal activity" as is required to make an investigatory stop; (2) that the officers "did not have probable cause to conclude that Defendant was guilty of a crime" as is required for an arrest; (3) that the "search of the [S]uburban was based on the involuntary consent of Defendant and resulted in a statement that was involuntarily made." Carrera's Motion to Suppress Evidence [Doc. # 73], at 2–3.

The Government acknowledges that it has the burden to justify the stop and the search and argues: (1) first and foremost, that the stop of the Suburban was proper under *Terry v. Ohio;* (2) that the stop of the Suburban was based upon probable cause to believe that a money laundering/narcotics violation had occurred; (3) that the items recovered from the Suburban are admissible because they were obtained pursuant to a lawful consent search; and (4) that, even assuming that Carrera's consent was not "voluntary," the seizure of the cocaine from the Suburban was proper because the stop of the vehicle and search thereof was supported by probable cause *or* was supported by the automobile

exception to the warrant requirement. Government's Response to Defendant[s'] Motion to Suppress Evidence [Doc. # 80], at 12–19.

The Court has carefully considered these arguments in light of the foregoing factual findings, which are based upon the testimony and demeanor of each witness at the suppression hearing. The Court concludes that the stop and search was justified, to the point of retrieval of the plastic envelope, under *Terry v. Ohio,* but that the officer's search inside the envelope was beyond the scope of a legitimate protective sweep. The Court further holds that Carrera's incriminating statement about his ownership of the cocaine found in the envelope was tainted as the "fruit" of an unlawful search, even though it was spontaneous and not in response to any question posed by the officers. Finally, the Court concludes that Carrera's consent to the officers' search of the car resulting in the discovery of $2,060 in cash was tainted by his unlawful arrest arising from the illegitimate discovery of the cocaine. Therefore, the Court suppresses all of the evidence resulting from the search of the black Suburban on August 15, 1996.

### A. *The Stop and Request for Identification*

██ This case presents a particularly difficult fact pattern for decision. However, after careful consideration of the applicable authorities and all the evidence adduced at the hearing, the Court concludes that the law enforcement officers had sufficient—albeit barely sufficient—objective information to form a "reasonable suspicion" that Carrera was engaging in a crime or was about to be engaged in criminal activity, and therefore had a legal basis to stop Carrera and subject him to a form of "seizure" under the Fourth Amendment to the Constitution. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1879–81; *Tellez,* 11 F.3d at 532. On the other hand, the Court finds the evidence clearly fails to establish probable cause to stop Carrera or to reach into the car for the vehicle's identification.[52]

---

52. The Government appears to have abandoned

the argument in light of the testimony and argu-

The officers articulated objective reasons to suspect that Carrera was participating in a narcotics transaction. On August 15, 1996, Officer Fullbright,[53] while conducting surveillance, observed Carrera drive slowly in a blue 1993 Suburban around the Motel parking lot on the east side of Houston in a well-known high drug trafficking area. Fullbright was aware that the Motel was a popular place for narcotics transactions. He observed Carrera initially drive past and appear not to know Zertuche, but upon returning some time later, stop to join Zertuche and others in conversation. Fullbright then saw Carrera park his vehicle, the blue Suburban, at the Motel and leave with Zertuche in the black Suburban in which Zertuche had arrived, even though there was no evidence that Carrera was registered at the hotel.

Fullbright also knew that, in 1992, Zertuche traveled from the Valley to Dallas with a man from whom government agents seized $23,000, on the suspicion the cash was proceeds of narcotics trafficking, and that neither Zertuche nor his companion tried to reclaim the currency after it was seized, despite being given a receipt for it at the time. Fullbright knew that Zertuche had been arrested by DEA in connection with a seizure of $400,000 in December 1995, although he then was released without charges. Fullbright was aware that Zertuche lived in South Texas and was visiting Houston midweek, and that he was driving a different car from the one he drove at the time of his arrest in December 1995. Furthermore,

Fullbright observed Zertuche's conduct that day, *i.e.*, that Zertuche and the passenger in his car engaged in a series of short meetings at the Motel and a nearby restaurant which were typical of narcotics transactions, all within the two-hour period before Zertuche left the area with Carrera.[54] Other narcotics officers whom Fullbright had enlisted then observed Carrera and Zertuche, in Zertuche's black Suburban, travel to the Kemp Hollow house on the far west side of Houston, put the black Suburban in the garage, and close the garage door in the middle of the afternoon. At approximately 2:00 p.m., about 20–40 minutes after arriving, Carrera left the house in the black Suburban and traveled back east on I–10. It was at this point that Carrera was stopped by Owen and other officers, so as to determine his identity and ask if he would consent to answer questions and to a search of his vehicle.

Carrera attacks the officers' purposes in stopping the car—which were to ascertain the identity of the driver, to determine if the car in fact was still owned and registered to Zertuche, and to seek to obtain consent to search the vehicle—arguing that these are insufficient reasons to justify the stop. The Court disagrees.

The facts in this case, taken together, provided the officers with "some minimal level of objective justification for making the stop," which amounted to "something more than an inchoate and unparticularized suspicion or hunch." *See Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585 (internal citations and quotation marks omitted). While each of the facts or

ment at the hearing. However, the Court states this conclusion, in an excess of caution, since the probable cause argument was asserted in the Government's Memorandum.

53. Fullbright had thirteen years of narcotics crimes investigation experience and was detailed specifically to watch motels and hotels because of the frequency of narcotics trafficking in those locations. The area of town and Motel at which Fullbright observed Carrera were known to Fullbright, from his extensive prior personal observations, as the location of frequent narcotics trafficking.

54. Fullbright stated that, in addition to the information and observations he had obtained as outlined in the text, he also was aware that Zertuche was, and that Carrera and all the individuals with whom they met appeared to be Hispanic.

Fullbright and Owen testified that in their experience this is one of many factors to be considered. Owen testified that the evidence in the record is uncontroverted that, by using all of these factors, including the Hispanic ethnicity of a suspect, he has successfully located illegal narcotics, or sizable sums of cash believed to be proceeds of narcotics transactions, 80 to 90% of the time he makes searches. Fullbright stated that he has found illegal drugs or substantial cash on at least 25 occasions in the last two years. The Court will not base any decision on the ethnicity of a suspect *per se* and does not rely on this factor in reaching the conclusions herein. *See Chavez–Villarreal*, 3 F.3d at 127 (despite Border Patrol's reliance, court accorded "very little" weight to defendant's Hispanic appearance).

characteristics supporting the officers' "reasonable suspicion" may, in isolation, "indicate wholly innocent behavior standing alone, [the Court must] examin[e] the entire picture." *Chavez–Villarreal,* 3 F.3d at 127.[55] The Court holds that the factors in this case, in combination, "yield articulable and objective manifestations of particularized suspicion" of drug trafficking. *See id.* (citing *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).[56]

As the United States Supreme Court stated, the analysis of data relevant to the existence of a reasonable suspicion so as to justify a stop "does not deal with hard certainties, but with probabilities," and the evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Ascertaining whether or not individuals are engaging in or assisting others in narcotics transactions is not an easy task. The evidence must be gathered bit by bit. In this case, to make inquiry of Carrera and to seek to verify ownership of the vehicle was not inappropriate.[57] These officers, who possessed extensive narcotics police experience and had previously been successful in discovering large sums of money and narcotics, articulated sufficient specific facts supporting their reasons for suspecting Carrera, and thus satisfy the standards of the Fourth Amendment.

Carrera relies most heavily on *Roch,* 5 F.3d 894, and *Chavez–Villarreal,* 3 F.3d 124, in support of his arguments that the stop and the subsequent search violate the Fourth Amendment. The Court is not persuaded. The Fifth Circuit in *Roch,* citing the Supreme Court's opinion in *Sokolow,* stated the relevant standard as follows: "If an officer observes suspicious activity, the Fourth Amendment requirement is satisfied if there is a 'minimal level of objective justification for the officer's actions, measured in light of the totality of the circumstances.'" *Roch,* 5 F.3d at 897. The *Roch* Court held that the officers had personally observed too little activity or other facts to develop a "reasonable suspicion" of criminal activity, because the only activity observed by agents was "a man and a woman leaving the motel parking lot in an white and orange pickup truck, and driving to a filling station." *Id.* at 897–98. Moreover, *Roch* was commanded by an officer with his gun drawn to lie face down on

---

**55.** *Compare, e.g., Cooper,* 43 F.3d at 147 (reasonable suspicion supported by the following: defendant had paid for bus ticket in cash just several hours before departure, was staying at destination only one night yet had purchased only a one-way ticket, allegedly was carrying no identification, entered bus station through boarding gate, was observed squirming in his seat with a "suspicious bulge" in his pants, attempted to draw officers' attention to his gym bag as a diversionary tactic, and was nervous); *United States v. Gonzales,* 842 F.2d 748, 753–54 (5th Cir.1988) (reasonable suspicion supported by the following: suspect's arrival from Miami, a "known source city for drugs"; suspect appeared nervous and watchful; suspect carried little luggage after traveling a long distance; suspect was "dressed loudly in a black and yellow shorts outfit"; suspect did not produce any identification when requested to do so by officers; and, most importantly, suspect "deliberately attempted to mislead law enforcement officials by claiming that she was remaining in the Dallas/Ft. Worth area for two to three days when in fact her return ticket indicated her departure was on a return flight that same afternoon"), *overruled on other grounds, United States v. Hurtado,* 905 F.2d 74 (5th Cir.1990).

**56.** As noted previously, Carrera argues that O'Sullivan and Owen admitted at the hearing that, once Carrera stopped and got out of his car, he was not free to leave until the questioning about the insurance and registration was completed. Carrera also places emphasis on Owen's acknowledgment that he had no official power to stop Carrera for a traffic violation, even if Carrera had committed one, and that Owen acknowledged that he could have done nothing if Carrera had refused to stop on the freeway. These matters are not dispositive. The officers were not hostile in their treatment of Defendant Carrera. He gave no indication that he wanted to leave before the license check was completed or that he objected to the inquiry by the officers. Moreover, the intent of the officers is irrelevant. *See Robinette,* —— U.S. at ——, 117 S.Ct. at 420–21 (officers' "'[s]ubjective intentions play no role in ordinary probable-cause Fourth Amendment analysis'") (quoting *Whren v. United States,* —— U.S. ——, ——, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996)). The Court recognizes that *Whren* and *Robinette* involve traffic stops and are thus of limited relevance.

**57.** As Owen testified, title to vehicles easily can be transferred.

the ground, and was handcuffed.[58] As noted above, the officers in the case at bar saw Carrera and Zertuche do far more, and the activities observed were qualitatively different from Roch's observed conduct. Therefore, Carrera's reliance on *Roch* for the proposition that there was an insufficient factual basis to constitute "reasonable suspicion" to stop and question him is unavailing.

Carrera's reliance on *Chavez–Villarreal* to measure "reasonable suspicion" is equally unpersuasive. In *Chavez–Villarreal,* 3 F.3d at 127, the Fifth Circuit held that there was insufficient information known to the Border Patrol to justify a stop of Defendant's car to investigate whether it was carrying undocumented aliens. Unlike in the case at bar, the Border Patrol officer had absolutely no information about the occupants of the car they stopped, but relied only upon observations such as the driver's race and demeanor, the make and model of the vehicle, Arizona license plates, and the fact that the driver changed lanes and slowed down when an unmarked police vehicle dropped in behind him. *Id.* As with *Roch,* the factors contributing to the officers' reasonable suspicion of Carrera were much more reliable, and *Chavez–Villarreal* does not compel a holding that the stop violated the Fourth Amendment.

The Court concludes that the observations and information known to the investigating officers in this case—while somewhat sparse—was sufficient to establish "reasonable suspicion" to justify the stop of Carrera so as to engage in preliminary investigation of his identity and to confirm the car's ownership.[59]

### B. Search for the Documents

Once the officers had pulled Carrera off the freeway based on reasonable suspicion, they were within their authority to request that Carrera show them his license, car registration and insurance so as to ascertain his identity and the owner of the car he was driving. *See Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401. The officers also were within their authority to order Carrera out of the car. *Tellez,* 11 F.3d at 533.

The Court must determine whether, under all the circumstances, either *Terry* or Carrera's consent justified O'Sullivan's refusal to allow Carrera to retrieve the requested documents personally, and/or O'Sullivan's examination of the contents of the small red plastic envelope he retrieved from the vehicle. For the reasons stated herein, the Court concludes that, while *Terry* permitted the officers to stop Carrera from obtaining the vehicle's documents, and permitted O'Sullivan to reach into the vehicle and obtain the documents' container (the plastic envelope), O'Sullivan exceeded the permissible bounds of *Terry* when he personally extracted the documents from the plastic envelope, rather than allowing Carrera to do so and without specifically seeking consent. Therefore, the contents of the envelope will be suppressed.

### 1. *Terry's Application to O'Sullivan's Retrieval of the Documents*

During a *Terry* stop, an officer who reasonably believes that he or she is dealing with armed and dangerous individuals may conduct a limited protective search for weapons. *United States v. Baker,* 47 F.3d 691, 693 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2632, 132 L.Ed.2d 872 (1995); *United States v. Michelletti,* 13 F.3d 838, 840 (5th Cir.) (en banc), *cert. denied,* 513 U.S. 829, 115 S.Ct. 102, 130 L.Ed.2d 50 (1994) (*Terry* countenances reasonable protective searches for weapons where officer has rea-

---

**58.** In *Roch,* the Government attempted to fill the void with the information supplied by a "reliable" informant personally known to one of the investigating officers. The Fifth Circuit closely analyzed the informant's information and ultimately rejected it for lack of sufficient detail. *Roch,* 5 F.3d at 898. Since no confidential informant is involved in Carrera's case, application of this holding of *Roch* is attenuated at best.

**59.** This holding makes it obvious that, in this Court's view, the Government failed to establish that probable cause to stop Carrera on August 15, 1996. Fullbright candidly stated as much. Owen also implicitly acknowledged this was his conclusion. The officers admitted they had no reason to stop Carrera for any traffic violation, although Pasadena Police Officer O'Sullivan presumably had authority to act on a traffic offense, if one had occurred. Furthermore, it does not appear that the Government argues that the stop was consensual; however, to the extent that argument is made, it is rejected.

son to believe, based upon "specific and articulable facts," that the suspect is armed and dangerous). The *Baker* Court held that

> the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Id.* (quoting *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480–81, 77 L.Ed.2d 1201 (1983) (internal citations and quotation marks omitted)).

■ The Court holds that O'Sullivan's retrieval of the plastic envelope from the vehicle in essence was part of a protective sweep of the car, permitted under *Terry* and its progeny. O'Sullivan testified that, when Carrera started toward the vehicle so as to retrieve the vehicle registration and insurance that were behind the driver's side visor, he was concerned about weapons in the car since the car had not been searched. Owen and O'Sullivan also testified that their suspicions were aroused since, during initial questioning, Carrera appeared nervous and provided information that the officers knew to be false about his presence at the Kemp Hollow residence. Carrera's behavior, in combination with the fact that the vehicle had not been swept for weapons, provided justification for O'Sullivan's decision to retrieve the documents from the vehicle himself. Although O'Sullivan did not execute a complete protective weapons sweep of the vehicle, he acted prudently and reasonably so as to protect his safety while pursuing a limited purpose: retrieval of the vehicle's registration and insurance.

■ However, the Court agrees with Carrera that, after O'Sullivan had retrieved the red plastic envelope containing the requested documents and it was clear that the envelope did not contain a weapon, *Terry* did not justify the officer's decision to pull the papers out of the envelope rather than allowing Carrera to do so.[60] *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *United States v. Ponce,* 8 F.3d 989, 999 (5th Cir.1993). A protective sweep under *Terry* is "limited to those areas in which a weapon may be placed or hidden," *Baker,* 47 F.3d at 693, and there was little, if any, chance that the contents of the envelope were dangerous. Indeed, O'Sullivan did not claim the need to search inside it for his own protection.

The scope of a search is defined by the search's object,[61] and in this case the object of the permissible search was not the vehicle's papers, but a weapon. As in *Ponce,* 8 F.3d at 999, the contraband nature of the contents of the envelope was not "immediately apparent" to O'Sullivan. Therefore, once the envelope was removed and the officers' safety was no longer threatened, O'Sullivan was required by the Fourth Amendment to cease his search. *Dickerson,* 508 U.S. at 377–78, 113 S.Ct. at 2138 (officer's "continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to '[t]he sole justification of the search [under *Terry:* ] . . . the protection of the police officer and others nearby,' " and "therefore amounted to the sort of evidentiary search that *Terry* expressly refused to authorize") (quoting *Terry,* 392 U.S. at 26, 29, 88 S.Ct. at 1882, 1884).

The Government has argued that it was not unreasonable, once the officer was holding the envelope, for him to take the final step of extracting the documents from the envelope. The Court construes this to be an argument for a "good faith exception" to the

---

**60.** As recited previously, when pulling the documents from the envelope, O'Sullivan discovered cocaine in the envelope, and thereafter placed Carrera under arrest.

**61.** *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803–04. Although an officer searching a car is not required to make "nice distinctions . . . between glove compartments, upholstered seats, trunks, and wrapped packages," the scope of the search must nevertheless be defined by the places in which the object of the search may be found. *United States v. Ross,* 456 U.S. 798, 821, 102 S.Ct. 2157, 2170–71, 72 L.Ed.2d 572 (1982).

limits on *Terry* protective searches.[62] At first blush, this argument has significant force, especially if one considers the object of the search to be the documents. However, the only legitimate object of the search by O'Sullivan at this point was a weapon, as part of a protective sweep. The Supreme Court has stated clearly that the scope of a protective search must be "strictly" limited to that which is necessary for the discovery of weapons. *Dickerson*, 508 U.S. at 373–75, 113 S.Ct. at 2136. Therefore, the Court concludes that no "good faith exception" is available to the Government in this case.[63]

## 2. *The Scope of Carrera's Consent as to Retrieval of the Documents.*

■ The Court further concludes that O'Sullivan's search of the contents of the envelope cannot be justified by Carrera's consent. Since O'Sullivan's conduct when he extracted the contents of the envelope was no longer authorized as part of a *Terry* protective search, and he neither sought nor secured Carrera's consent to search inside the envelope, the retrieval of the documents was prohibited by the Fourth Amendment.

A Fifth Circuit panel has recently held that consent cannot reasonably be implied from a suspect's silence or failure to object unless the officer expressly or impliedly asked for consent to search. *United States v. Jaras*, 86 F.3d 383, 390 (5th Cir.1996) (citing cases). As in *Jaras*, O'Sullivan did not expressly or implicitly request Carrera's consent to search inside the envelope. Mere acquiescence to a show of lawful authority does not equate with consent. *Bumper v. North Carolina*, 391 U.S. 543, 548–59, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968); *Jaras*, 86 F.3d at 390; *Cooper*, 43 F.3d at 147.[64]

When Owen or O'Sullivan requested the car registration and insurance, Carrera started to go for the documents. The evidence of record is that Owen or O'Sullivan then *told* Carrera, rather than asking him, that an officer would get the documents instead. The officers asked where the documents were located and Carrera responded, in English, that they were behind the driver's side visor. Carrera then stood silently as O'Sullivan stepped over to the Suburban, opened the passenger door, reached inside and across the front seat to the driver's side visor, pulled out the plastic envelope, and then exited the car and rejoined Carrera. Although there is no evidence as to exactly how long this took, the officers' simple descriptions lead the Court to conclude that the officers' request and retrieval of the packet could have taken no more than a minute or two. At no time did Carrera object or suggest that he reach into either the car or the envelope for the documents. As the very next act, apparently immediately thereafter, O'Sullivan himself reached into the envelope and pulled out its contents. Carrera was asked nothing and O'Sullivan neither said nor asked anything before pulling the documents, and with them, the cocaine, out of the envelope.

**62.** The "good faith exception" to the exclusionary rule provides that "evidence is not to be suppressed ... where it is discovered by officers in the course of actions that are taken in good faith *and in the reasonable, though mistaken, belief that they are authorized.*" *United States v. Ramirez–Lujan*, 976 F.2d 930, 932 (5th Cir.1992), *cert. denied*, 507 U.S. 987, 113 S.Ct. 1587, 123 L.Ed.2d 153 (1993) (internal citations and quotation marks omitted) (emphasis added) (holding that it was objectively reasonable for an experience border patrol agent to conclude that the stop of a truck was supported by reasonable suspicion).

**63.** Moreover, none of the four exceptions to the exclusionary rule identified in *United States v. Sheppard*, 901 F.2d 1230, 1234 (5th Cir.1990)— *i.e.*, (1) good faith reliance on objectively valid warrant; (2) attenuated nexus between illegal police activity and attainment of evidence; (3) evidence obtained from source independent of illegality; and (4) evidence inevitably would have been discovered lawfully—applies to the facts of the case at bar.

**64.** For reasons similar to those that make the case at bar a close question, the *Jaras* majority opinion has been criticized strenuously. *See United States v. Jaras*, 96 F.3d 764 (5th Cir.1996) (Barksdale, J., dissenting from denial of rehearing en banc); *Jaras*, 86 F.3d at 391–94 (Duplantier, J., dissenting) (arguing district court was correct to rely on *United States v. Varona–Algos*, 819 F.2d 81 (5th Cir.), *cert. denied*, 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 255 (1987)). In the case at bar, there was arguably no consent at all: Carrera was never asked any question, and the prior "search," *i.e.*, retrieval of the envelope from the car, is construed as part of a protective sweep.

The Government has argued that Carrera gave implied consent for retrieval of the envelope from the vehicle and that afterwards, it was not unreasonable for the officer to assume that he had also been given consent to remove the documents from the envelope. The Court is not persuaded. Carrera had been stopped on reasonable suspicion and, as noted previously, the officers acted within their authority under *Terry* when they performed a limited protective sweep of the vehicle. Carrera, therefore, was *required* to comply with the officers' instruction not to retrieve the envelope from the vehicle. He was not permitted to refuse or to state that he preferred to retrieve the documents himself. His statement to the officers informing them that the documents were located over the driver's side visor therefore in no way indicated consent; it merely was acquiescence. Moreover, his statement explaining the location of the documents does not indicate consent for the officer to go beyond the bounds of *Terry* and remove the contents of the envelope. That statement also was a form of acquiescence to the officers' directive that he allow them to retrieve the documents.

The Government has not identified any statement or gesture by Carrera at any point in his encounter with the officers, other than the statement noted above and his movement towards the car to get the papers, which could have implied consent. Moreover, the Government has not identified any statement or gesture by the officers that could be construed as a *request for consent*. Indeed, O'Sullivan candidly acknowledged that he did not explicitly ask permission to either retrieve the envelope from the car or look inside the envelope. Although "a failure to object to the breadth of the search is proper-ly considered 'an indication that the search was within the scope of the initial consent,'" [65] in this case there was no initial consent at all, and therefore the "scope of consent" analysis is not properly applied.

Finally, to the extent Carrera's acquiescence could be construed as implied consent, the Court would conclude that such consent was not voluntary under the Fifth Circuit's six factors for evaluation of voluntariness of consent. *See Jenkins*, 46 F.3d at 451.[66] First, as to the "voluntariness" of Carrera's "custodial status," the stop was not consensual. Second, as to the coerciveness of the officers' procedures, although there was no rough or aggressive treatment, no guns were drawn, and no officer frisked or physically touched Carrera, the procedures were coercive. Carrera was told—not asked—that the officers would retrieve the envelope from the vehicle. He was never asked, expressly or otherwise, for consent to remove the documents from the envelope.[67] O'Sullivan testified that he extracted the documents from the envelope right after it was removed from the vehicle. The Court concludes that this act was indistinguishable to any observer (such as Carrera) from the protective sweep, which was a coercive act. Third, although Carrera cooperated with the officers, Owen still had his license and so the setting remained coercive and Carrera had no choice but to cooperate. Fourth, there is no evidence, and the Government does not argue, that Carrera was told of his right to refuse consent.[68] Fifth, while Defendants adduced no specific details about Carrera's age, education or intelligence, the Government established that the officers who dealt with Carrera found him to be at least of average intelligence, and the testimony by Zertuche

---

**65.** *United States v. McSween*, 53 F.3d 684, 688 (5th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 199, 133 L.Ed.2d 133 (1996) (quoting *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994)). *See also United States v. Stewart*, 93 F.3d 189, 192 (5th Cir.1996) (a suspect's permission for officer to "look at" a medicine bottle implied permission for the officer to "look inside" the bottle); *United States v. Crain*, 33 F.3d 480, 484 (5th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1142, 130 L.Ed.2d 1102 (1995) (general consent to search a car includes consent to open a paper bag inside the car, at least when suspect does not attempt to limit scope of search).

**66.** Indeed, the results of the *Jenkins* analysis reinforces the conclusion that there realistically was no consent by Carrera for O'Sullivan to look inside the envelope.

**67.** Carrera argues other evidence of coercion is that he was "told to get out of his car" and "told where to stand" when talking with the officers.

**68.** Carrera did not have a right to terminate the encounter, since he was in a *Terry* stop and Owen had his license.

about Carrera supports this conclusion. Finally, there is evidence that Carrera believed there would be incriminating evidence in the car, since he later claimed that the drugs were his and that he used them to stay awake.

■ For all of the foregoing reasons, the Court holds that the search resulting in discovery of cocaine violated the Fourth Amendment, and therefore that Carrera's subsequent arrest was unconstitutional.

### C. *Carrera's Statement after the Miranda Warnings.*

■ After Carrera had been placed under arrest and had received *Miranda* warnings, he spontaneously stated that the cocaine was his and that he used the cocaine to keep awake when he was driving. Apparently, there was no question pending from the officers. Under ordinary circumstances, the statement would be deemed voluntary. *See Broussard,* 80 F.3d at 1033 (confession is voluntary "if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice").[69]

■ However, voluntariness alone cannot justify admission of Carrera's statement. A statement made by a suspect after an illegal arrest "should not be suppressed if it is *both* voluntary *and* sufficiently removed from the illegal seizure to break the causal chain linking the statement to the arrest." *United States v. Blount,* 98 F.3d 1489, 1497 (5th Cir.1996) (emphasis added). In this case, the statement was made shortly, if not immediately, after the arrest and without intervening circumstances. The Court therefore holds that, even though Carrera's statement was voluntary, it was "not so attenuated as to be purged of the illegal arrest's taint." *Id.* Therefore, the statement is suppressed.

### D. *Consent to Search Vehicle and Discovery of Hidden Cash*

■ After placing Carrera under arrest, the officers asked for his consent to search the vehicle. Carrera consented both orally and on a DEA consent form, which was in English. Upon searching the vehicle, the officers found $2,060 in cash. The Court must address whether, because the arrest has been held to be illegal, the cash must be suppressed as "fruit of the poisonous tree." *See Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

In particular, the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Brown,* 422 U.S. at 599, 95 S.Ct. at 2259 (internal citations and quotation marks omitted). "Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation." *Chavez–Villarreal,* 3 F.3d at 127 (citing *Brown,* 422 U.S. 590, 95 S.Ct. at 2255). The Fifth Circuit has held:

> The admissibility of the challenged evidence turns on a two-pronged inquiry: whether the consent was voluntarily given and whether it was an independent act of free will. The first prong focuses on coercion, the second on causal connection with the constitutional violation. Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will. To determine whether the causal chain was broken, we consider: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. The burden of showing admissibility rests on the government.

*Id.* at 127–28.

In this case, the illegal search and the consent were close in time, militating in favor of suppression. The intervening circum-

---

**69.** O'Sullivan may have told Carrera, after Owen gave the *Miranda* warning, that Carrera did not have to answer questions.

stances were Carrera's arrest and receipt of his *Miranda* warnings,[70] and Carrera's statement about the small quantity of cocaine. The officers here had possession of Carrera's license, and the vehicle's registration and insurance documents. *Compare Chavez–Villarreal*, 3 F.3d at 128. In general, these intervening circumstances were coercive in nature.[71]

As for the third factor, there is no evidence of flagrant misconduct by the officers, and the officers had individualized suspicion of Carrera sufficient to justify a *Terry* stop. *Compare United States v. Richard*, 994 F.2d 244, 252 (5th Cir.1993) (officers reasonably believed they had suspect's consent, approached suspect reasonably and truthfully and did not mislead her in any way) *with United States v. Pierre*, 932 F.2d 377, 390 (5th Cir.1991), *cert. denied*, 506 U.S. 898, 113 S.Ct. 280, 121 L.Ed.2d 207 (1992) (border patrol agent improperly poked his head inside car so as to search for evidence of wrongdoing, without any individualized suspicion, and therefore search was flagrant Fourth Amendment violation).

The Court holds, weighing the three factors, that Carrera's purported consent was not an independent act of free will.[72] Therefore, his oral and written consent are tainted and the results of the search of the vehicle, *i.e.*, the $2,060 in cash, must be suppressed.

### E. *Conclusion*

Carrera's Motion to Suppress is granted in its entirety.

---

**70.** The fact that *Miranda* warnings were given is a factor that is important, but not dispositive. *See Brown*, 422 U.S. at 603, 95 S.Ct. at 2261–62; *Chavez–Villarreal*, 3 F.3d at 128 (suspect was told he could refuse to consent to second search, but by then refusal seemed pointless since officer had divulged his suspicion of narcotics).

**71.** It is unclear whether the officers testified that Carrera was handcuffed incident to his arrest. It is likely that he was. If so, then this is another intervening factor that militates against the consent to search having been freely given.

**72.** This conclusions renders it unnecessary to reach the *Jenkins* factors as to the voluntariness

## III. *THE QUESTIONING OF ZERTUCHE AND HIS CONSENT TO SEARCH*

Defendant Zertuche argues that the fruits of the officers' search of the Kemp Hollow residence and his statements made in connection with the officers' questioning of him should be suppressed on various Fourth Amendment grounds:

(1) that his consent to the warrantless search "was not given freely, voluntarily and without duress, threat or coercion," Zertuche's Memorandum, at 1–6;

(2) that he "was in custody and should have received *Miranda* warnings before being interrogated," *id.* at 6–9;

(3) that "police had no legal authority to search before obtaining a valid voluntary consent to search," *id.* at 9–10;

(4) that "an arrest occurred when the officer ordered Zertuche not to move," *id.* at 10;

(5) that Zertuche was "seized without probable cause," *id.* at 10–14;

(6) that "[c]ustodial interrogation occurred when the officer asked Zertuche if weapons, drugs or money were in the residence," *id.* at 14–15;

(7) that "[h]aving been seized by the officers' words and conduct, Zertuche and the officers were not involved in a consensual police-citizen encounter," *id.* at 15–16;

(8) that an "invalid protective sweep was performed by the officers before consent was obtained," *id.* at 16.

---

of consent. If the Court were required to reach the voluntariness issue, however, the Court would conclude that the consent was not voluntary. Carrera was in custodial status; the officers had used coercive, albeit only gently coercive, procedures of required Carrera to allow the officer to search the vehicle for the documents, pulling the documents from the envelope without permission, and then retaining Carrera's documents and placing him under arrest; Carrera merely acquiesced in the officer's directives, but could not be said to be voluntarily cooperating with their "requests"; and Carrera was not told he had a right to refuse the request to search. *See Jenkins*, 46 F.3d at 451.

Zertuche argues that all fruits of the search of the Kemp Hollow residence and his incriminating statement, *i.e.*, that he knew that there were two guns and narcotics in a closet in the house, should be suppressed because they were obtained after he was in custody or under arrest and was entitled to receive *Miranda* warnings.

The Government disputes each of these contentions as well as the factual basis on which many of them are based. In particular, the Government responds that the search and the incriminating answer to the officer's question were pursuant to Zertuche's consent, which was given freely and voluntarily.[73]

The Court's foregoing findings of fact are deemed incorporated as necessary into the following legal analysis.

### A. *Zertuche's Custodial Status* [74]

Defendant Zertuche argues in various contexts in his Memorandum that his encounter was transformed into a *"Terry*-type" investigative detention because the circumstances surrounding the incident would have led a reasonable person to believe that he or she is not free to go.

■ The first issue implicated by Zertuche's argument, although Zertuche does not assert it explicitly, is whether the officers' knocking on the front door and *requesting* to talk to Zertuche, often referred to by the police as a "knock and talk," constituted a custodial interrogation or otherwise implicated the Fourth Amendment. The Court determines that it did not. As noted by the Fifth Circuit in reliance upon longstanding the Supreme Court authority:

> Warrantless searches and seizures inside someone's home are presumptively unreasonable *unless the occupants consent* or

exigent circumstances exist to justify the intrusion.... Thus, if agents have no warrant and no consent, even if they have probable cause and statutory authority to arrest a suspect, they must also have exigent circumstances to enter.

*United States v. Richard,* 994 F.2d 244, 247 (5th Cir.1993) (citing *Arizona v. Hicks,* 480 U.S. 321, 327–28, 107 S.Ct. 1149, 1153–54, 94 L.Ed.2d 347 (1987); *Payton v. New York,* 445 U.S. 573, 586, 590, 100 S.Ct. 1371, 1380, 1382, 63 L.Ed.2d 639 (1980)) (emphasis added). Furthermore, the "knock and talk" technique, a "noncustodial procedure where the officer identifies himself and asks to talk to the home occupant and then eventually requests permission to search the residence," has been "recognized as a manner of consent search." *United States v. Cruz,* 838 F.Supp. 535, 537, 543 (D.Utah 1993); *see also United States v. Heath,* 58 F.3d 1271 (8th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 240, 133 L.Ed.2d 167 (1995); *United States v. Tobin,* 923 F.2d 1506, 1511 (11th Cir.1991), *cert. denied,* 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991); *United States v. Miller,* 933 F.Supp. 501, 505 (M.D.N.C.1996); *United States v. Woodard,* 873 F.Supp. 535 (D.Kan.1994), *aff'd,* 91 F.3d 160 (10th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 495, 136 L.Ed.2d 387 (1996). As Zertuche cites no authority establishing that the officers were not permitted to knock on the Kemp Hollow door and request to talk to Zertuche, the Court holds that officers properly may initiate such contact. The Court further holds that the officers' initial interview with Zertuche and Duran was consensual.

Next and most significantly, Zertuche argues that when the officers directed Zertuche to show his hands and to come to the front door, they took him into custody and/or

---

73. The Government also argued initially that Duran, who is the lessee of the residence and who lived there full-time, voluntarily consented. *See* Government Exhibit 4 (Houston Lighting and Power Contract bearing Duran's signature). However, after pleading guilty, she became a fugitive and did not appear at the suppression hearing. The testimony of Agent Downing strongly indicates that Duran gave consent, but since that was not the focus of the hearing and there was very little questioning on this aspect of the consent argument, the Court will not address or rely on it in reaching its conclusions.

74. This section addresses Zertuche's second, fourth, fifth, sixth and seventh arguments, as listed above.

subjected him to a *Terry* stop.[75] Zertuche focuses specifically on the point, near the beginning of the encounter at the Kemp Hollow house, at which Agents Owen and/or Downing told him to "[g]et your hands up where we can see them and come over here." [76] Zertuche's Memorandum, at 6–9. He relies on Owen's testimony that Zertuche was, in the agent's opinion, not free to leave as soon as the encounter commenced and that if Zertuche had not given consent, he would have been detained while the agents made a protective sweep and obtained a search warrant.

As Zertuche argues, a determination of "custody" is necessarily fact intensive. Since *Terry v. Ohio*, the Supreme Court has held that:

> Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

*Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. *Accord Bostick*, 501 U.S. at 434, 111 S.Ct. at 2386. Although law enforcement officers may seize a person by means of a "show of authority" without exerting physical force, "[a]s a legal term of art ... 'show of authority' has the meaning given it by *Chesternut*: there is a show of authority by an officer if, but only if, a reasonable person believes he is not free to leave." *United*

States v. Valdiosera–Godinez, 932 F.2d 1093, 1099 n. 2 (5th Cir.1991), *cert. denied*, 508 U.S. 921, 113 S.Ct. 2369, 124 L.Ed.2d 275 (1993).

■ Thus, the issue is whether the officers' instruction to Zertuche to show them his hands and to come to the door constituted a sufficient "show of authority" so as to constitute a "seizure" of Zertuche for the purposes of the Fourth Amendment. The Court has found that Agents Owen and Downing spoke in a clear and firm voices, but did not make unreasonable, offensive or aggressive demands on Zertuche. Furthermore, there was no show of force or authority by the officers, other than for the brief period as noted above. Once Zertuche complied with the officers' limited directive to demonstrate that he was not armed, the officers changed their tone of voice, framed inquiries in question form and engaged in no coercive or intimidating conduct. Although Agent Owen had his gun drawn at the outset,[77] it was hidden from the view of people in the house, and he put the gun away as soon as Zertuche showed that his hands were empty and began to come to the front door. The officers then explained who they were and stood on the stoop, or at most a few feet outside the front door to the house. There were not any guns or weapons pointed at Zertuche or Duran at any time. When the officers were talking face-to-face with Zertuche, there were no guns drawn or even in sight. The entire encounter to that point was at most a matter of minutes.

---

**75.** Zertuche's Memorandum, written in anticipation of his own testimony, actually argues that the armed officers stormed into the house, told him not to move, and required him to go with them outside. Since the Court has found this testimony to lack any credibility, the Court has addressed Zertuche's arguments as modified and applied to the facts as found by the Court. Prior to oral argument on November 6, 1996, counsel were informed of the Court's findings in this regard and counsel therefore conformed their oral argument appropriately.

**76.** The evidence is unclear as to whether the instruction was in the form of a question. This distinction is not significant here. Downing's testimony suggests that he or Owen may have posed it as a question. Owen's own testimony

suggests that it was a directive. Therefore, the Court has found that the officers gave a firm instruction and analyzes the law accordingly.

**77.** Owen testified that he had his gun drawn and hidden behind his back when he and the others initiated the meeting. Presumably, it was drawn until the officers ascertained that Duran and Zertuche were not carrying weapons and they came outside to the stoop. While defense counsel makes much of the fact of Owen's drawn gun, Zertuche did not testify that he saw any guns while outside the house. Since the Court does not credit Zertuche's explanation that several officers stormed into the house with guns pointed at him, Owen's initially drawn gun does not change the Court's conclusion in this case.

Zertuche appears to argue that the officers' jackets with "POLICE" in large letters on them, often called "raid jackets," constituted a show of authority. The Court disagrees. While two of the officers were wearing raid jackets and another was a uniformed police officer, this was merely a reinforcement of what Agent Downing was telling Duran and Zertuche, *i.e.*, that they in fact were law enforcement officers investigating narcotics transactions. The officers explained that clear identification is important so others will not fear that an intruder is trying to rob or break into the house. These indicia did not convert this consensual encounter into custodial status. *Cf. United States v. Boone*, 67 F.3d 76, 78–79 (5th Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 965, 133 L.Ed.2d 886 (1996); *Valdiosera–Godinez*, 932 F.2d at 1099.

Zertuche also argues that the number of officers was coercive. While the Court concurs that the presence of five to eight officers in the immediate area is more psychologically intrusive than one or two officers, the number of officers alone does not convert this encounter into custody. *See and compare United States v. Rojas*, 783 F.2d 105, 108 (7th Cir.), *cert. denied*, 479 U.S. 856, 107 S.Ct. 195, 93 L.Ed.2d 127 (1986) (four officers with guns drawn and pointed at defendants at close range for several minutes each held to be "no unnecessary display of weapons," and consent found to be freely and voluntarily given).[78]

The Court concludes, based on all the circumstances presented, that Zertuche was not "seized" until after he had given voluntary consent to search the house and the cocaine had been found.[79] The encounter between Zertuche and the officers was not converted to a *Terry*-type stop by the officers' directive that Zertuche raise his hands and come to the front door of the house. The conduct by the officers was the least intrusive means of dealing with a potentially dangerous situation, and was not unreasonable. Their directive was given solely so as to guarantee their safety, and was narrowly tailored to that end.[80] Once it was clear that Zertuche was not armed, the officers' tone and the encounter resumed its initial character, a consensual discussion in which officers made genuine inquiry seeking consent to search the residence. The Court holds that, when the officers asked Zertuche for consent to search the house, a reasonable person would have felt free to ask the officers to leave and decline consent. *See Valdiosera–Godinez*, 932 F.2d at 1099 n. 2.

The Court nevertheless recognizes that this is a close question, given the officers' directive that Zertuche show his hands and come to the door of the house. Zertuche cites the Court to *United States v. Alarcon–Gonzalez*, 73 F.3d 289, 292 (10th Cir.1996), in which the Tenth Circuit held that a command

---

**78.** Zertuche further testified that a person he had seen before, presumably FBI Agent Boudreau, asked about weapons in the house and used a pejorative term, "fat boy," in connection with the statement. The Court has found that if even made, this comment was made after Zertuche had given at least oral consent to Agent Downing. Thus, this comment would not change the Court's overall assessment of the voluntariness of Zertuche's consent or his custodial status.

**79.** By comparison, in *Boone*, 67 F.3d at 78–79, several officers boarded a bus, identified themselves as law enforcement officials, stated they were looking for contraband or illegal immigrants, and asked everyone to leave the bus. Several other officers with visible, holstered guns and other insignia of authority were outside the bus. As Boone came off of the bus, an officer tapped him on the shoulder and asked to speak to him, then received consent to search his bag. The Court held that, although it was a very close question, a reasonable person would have felt free to leave without answering questions and refuse the officers' request to search, and that there was no seizure. *See also Valdiosera–Godinez*, 932 F.2d at 1098–99 (officers approached men at self-storage unit, showed their badges and announced they were federal officers, motioned for the men to come outside, and asked one man twice to drop the pliers he was holding; the Court upheld the district court's holding that there was no seizure, noting that there was no display of weapons, that the defendants' paths were not blocked, and that no statement of suspicion was made).

**80.** The evidence from the experienced law enforcement witnesses is uncontradicted that when narcotics crimes are being investigated, there is a high likelihood of the presence of weapons near the narcotics and money. This pattern is borne out by the facts of the case at bar.

to "freeze," based on an officer's belief that the person had a weapon, had the effect of converting a consensual encounter into a nonconsensual seizure.[81] *See also Valdiosera–Godinez*, 932 F.2d at 1099 (noting that in *Chesternut*, the Supreme Court listed a command to halt as one factor that *could* support a finding of seizure).

■ The Court therefore further holds that even if the encounter were converted to a seizure by the officers' directive, the officers' actions would be constitutionally permissible because, as the Court's previous analysis demonstrates, there was "reasonable suspicion" to support a *Terry* stop of Zertuche. *See supra* at 820–23.[82] Moreover, if the encounter were viewed as a *Terry* stop, the officers' directive then clearly would be justified as a protective sweep.

## B. *Voluntariness of Zertuche's Consent to Search and Answers to Incriminating Questions.*[83]

■ The primary issue before the Court is whether Zertuche's oral and written consent to search the house,[84] and his responses to the investigating officers' questions, were voluntary and given without coercion.[85] The Court notes that, since consent may be freely and voluntarily given during a *Terry* stop as well as during a consensual encounter, the following analysis of consent is unaffected by whether or not Zertuche was "seized." [86]

### 1. *Voluntariness of the Consent to Search*

The Court previously has enumerated the six *Jenkins* factors that must be analyzed to determine if Zertuche's consent to search the

81. *Alarcon–Gonzalez* differs from the case at bar on several points, including the fact that the officers in *Alarcon–Gonzalez* lacked any individualized suspicion as to the persons ordered to freeze. Furthermore, the Tenth Circuit specifically relied upon the fact that, following the "freeze" command and before questioning regarding immigration status, the officers had done nothing to communicate to the defendants that they were free to leave. *Id.* at 292. Finally, the Supreme Court has since held that no such communication by the officers is required. *Robinette*, —— U.S. at ——, 117 S.Ct. at 421–22.

82. The facts of which the officers were aware at the time were more probative and gave rise to stronger suspicions as to Zertuche, the subject of the prior DEA and the current local investigations, than as to Carrera.

83. This section addresses Zertuche's first, third and eighth arguments, as summarized *supra* at 828–29.

84. Zertuche contends that he has standing to challenge the search of the residence. As noted previously, Zertuche initially testified that he visited Houston "frequently." *See supra* at 815. Since the Government appeared initially to challenge Zertuche's standing, Zertuche introduced extensive evidence on his relationship with the house. Regardless of the exact number of times Zertuche had slept at the Kemp Hollow residence or used the key Duran had given him, the Court holds Zertuche had an actual, subjective expectation of privacy with respect to the residence, and that his expectation is one society would recognize as reasonable. *See United States v. Wilson*, 36 F.3d 1298, 1302–03 (5th Cir.1994) (overnight guest has sufficient expectation of privacy so as to confer standing). Zer-

tuche therefore has standing to challenge the search.

85. The Court has found, contrary to Zertuche's testimony, that the officers did not commence their encounter with Zertuche by entering the residence and pointing their guns at him. However, the arguments Zertuche asserts will be considered as applied to the facts found by the Court. Zertuche argues that the police procedures were coercive when he was taken from the house, when he was detained, and when the officers questioned him about the presence of arms or drugs in the residence. Zertuche's Memorandum, at 1–5. He urges that he did not feel and no reasonable person would have felt free to leave, to deny the officers access to the residence, or to refuse to answer the officers' incriminating questions. *Id.* at 4–6. He further argues that the consent followed a Fourth Amendment violation and thus was involuntary. *Id.* at 6; *see id., passim*.

86. Zertuche argues that where the purportedly consensual search is preceded by a Fourth Amendment violation, the government must prove not only the voluntariness of the consent under the totality of the circumstances, but also must establish a break in the causal connection between the illegality and the evidence thereby obtained. Zertuche Memorandum, at 6 (emphasis added) (citing *United States v. Melendez–Garcia*, 28 F.3d 1046, 1053 (10th Cir.1994); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)). Given the Court's prior holding that Zertuche was not seized and that, even if he were seized, such seizure would have been supported by reasonable suspicion, the Court need not reach this argument.

home was voluntary. These factors are again applicable here.

**a.** *Custodial Status.*—The Court previously has held that Zertuche was not seized or otherwise placed in custody when he was told to show his hands and come to the door, and that his encounter with the officers was consensual. *See supra* at 829–32.

**b.** *Coerciveness of Police Conduct.*— The police procedure was not inherently coercive. While the sanctity of one's home is significant,[87] the Court is not prepared to hold that law enforcement officers may not approach a private residence and request permission to ask questions or to search. *See supra* at 829. With one unobtrusive exception (Owen's hidden gun), there were no visible weapons drawn. No officer entered the home. The only coercive police action was limited in scope: After seeing Zertuche reach down to an area out of the officers' line of sight, one or two officers, out of fear for their own safety, directed Zertuche to show his hands and come to the door, so that they could determine that he did not have a weapon. This was a discrete and reasonable request, and the exchange was very brief. Once Zertuche complied and the officers no longer were concerned about their safety, the officers recommenced their inquiries in a polite tone of voice. There is no evidence that weapons were visible or used in any way while the consensual encounter took place (*i.e.,* until the cocaine, weapons and/or money was found). Agents Downing and Owen testified, and convinced the Court, that they were considerate, courteous and careful individuals. Their demeanors were not overbearing.[88] There is no credible evidence that either of these officers were aggressive or unreasonable in his dealings with Zertuche or Duran.[89]

**c.** *Defendant's Cooperation.*—Defendant Zertuche cooperated with the police. Defendant's argument that the cooperation only consisted of complying with the officers' "requests and orders" begs the question. Zertuche could have, after showing his empty hands to the officers and hearing Agent Downing's questions, asked that the officers leave, told them he did not want to come outside, said he did not understand the questions, or said that he wanted to think about the inquiries by the officers. Alternatively, he could have come to the door, shown his hands and then told the officers he did not want to talk to them.

Moreover, as for the officer's question of whether there were any weapons, narcotics or money in the house, which Zertuche has referred to as the "incriminating question," Zertuche could have declined to answer, claimed he did not know the answer, said he would like to think about whether to answer, or simply said he did not understand what the officers were asking.

**d.** *Right to Refuse.*—Defendant Zertuche was told by Agent Downing—at least in passing—that he could refuse the requests to search the house. This supports the Government's argument that his consent was voluntary, especially given the Supreme Court's recent holding that a defendant need not be advised that he is free to leave before consent is recognized as voluntary. *See Robinette,* —— U.S. at ——, 117 S.Ct. at 421–22. Moreover, even if there were no explicit statement by the officers that Zertuche could refuse the request, Zertuche's consent to search the residence may nevertheless be valid under all the circumstances presented.

**e.** *Education and Intelligence.*—Defendant Zertuche, who was thirty years of age, possessed more than average intelligence and

---

87. *See, e.g., Fontenot v. Cormier,* 56 F.3d 669, 676 (5th Cir.1995) (home is " 'entitled to the strictest Fourth Amendment protection against unwarranted intrusions' ") (quoting *Wanger v. Bonner,* 621 F.2d 675, 682 (5th Cir.1980)).

88. Downing at one point described his first statement to Zertuche as: "please raise your hands so [the officers] can see that they are empty and come to the door."

89. The Court has not found a reported appellate decision with facts quite comparable to those presented here. This case does not present circumstances of the egregious nature in *Fontenot* that provoked the court to hold that a suspect does not consent to entry of a residence when the consent is prompted by a "show of official authority," *Fontenot,* 56 F.3d at 675. Moreover, the officers here did *not* enter the residence immediately, but requested Zertuche to come outside.

education. He attended three years of college in Mexico, during which time he studied law.[90] His testimony established to the Court's satisfaction that he was capable of understanding at least a little English.[91]

Zertuche argues here that because he had no understanding that under American law he could refuse a request by the officers, the consent was invalid. The Court does not find this argument probative. Even if an understanding of American law were a requirement, which it is not, Zertuche had extensive exposure to the United States through his travels to Texas from Mexico. He visited the United States for one or more days at a time, more than a dozen times a year, from the time he was six years old. By his own estimate, he came to the United States hundreds of times either to shop, to engage in business, or for entertainment. He also moved to Texas to live with his wife in 1988. Finally, he studied law in Mexico, and had been involved in two DEA seizures and/or arrests in the United States within the previous three years.[92]

Furthermore, Zertuche's argument fails because he conceded that the officers orally *asked* his permission to search. *Cf. Jaras*, 86 F.3d at 390. They then showed him, as his own testimony establishes, the DEA Consent Form. *See* Government Exhibit 2 (signed consent form). He stated that he understood, as written on the form in clear and simple English, that by signing he was indicating that his consent was given "freely and voluntarily" and that he had not been forced or coerced to so. Thus Zertuche's own testimony contradicts his contention that he believed he was required to sign the form and that he was being forced to do what the officers requested.

*f. Belief of Existence of Incriminating Evidence.*—Finally, the last factor as to the voluntariness of the consent to search is whether the suspect believed incriminating evidence would be found. It is most likely that Zertuche knew that the officers would find the guns and some of the money, which were in plain view, if not the cocaine and the rest of the cash as well. Indeed, it is most likely that that is the reason he mentioned these items when asked the "incriminating question" by the officer. Since Zertuche testified before the Court that he believed that the officers would search even if he did not consent, it may be that he elected to cooperate, despite the incriminating evidence, in the hope that it would somehow help him later.

Therefore, based upon the six *Jenkins* factors, the Court holds that Zertuche's consent to search given to Agents Downing and Owen was voluntary, not coerced, and was freely given when viewed in light of the totality of the circumstances.[93]

---

**90.** Dr. Tony Barrio, Zertuche's polygraph expert, testified that Zertuche was very capable and had an excellent vocabulary. While Dr. Barrio's conclusions as to the polygraph results and the report itself were not received in evidence since they did not pass muster under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), his testimony as to observations of Zertuche are admissible as part of the record. Dr. Barrio's experience, training, and various masters and doctorates clearly rendered him qualified to give an opinion on this matter. *See* Zertuche Exhibit # 41 (Barrio resume).

**91.** Zertuche argued that he "is not fluent in English." Zertuche's Memorandum, at 4. The Court assumes the truth of the statement for the sake of this argument. However, this statement is not probative since fluency is not the standard. The only material issue is whether Zertuche understood what he was being asked when the officers were requesting permission to search the house. The Court has found Zertuche understood the questions and his proficiency in English was sufficient for purposes of his dealings with the officers in this case. Moreover, he clearly was capable of stating in Spanish, when he had trouble with a question that was asked, that he did not understand.

**92.** *Compare Gonzales,* 79 F.3d at 421 (voluntary consent by defendant who was a former attorney and undoubtedly was aware that he was not required to consent, who had a prior record and experience with law enforcement procedures, and for whom there was no evidence that he was "of below average intelligence").

**93.** Zertuche relies to no avail on *United States v. Kim,* 25 F.3d 1426 (9th Cir.), *cert. denied,* 513 U.S. 1030, 115 S.Ct. 607, 130 L.Ed.2d 517 (1994). Application of the factors identified by the Ninth Circuit as "militat[ing] against a voluntariness determination"—a suspect's custodial status, drawn guns by the officers, the absence of *Miranda* warnings before search, a statement by the officers that the suspect had the right to refuse consent, and the officers' threat to obtain a search warrant—do not result in a different outcome.

### 2. *Scope of Search*

■ The Court next concludes that the scope of the search did not exceed Zertuche's consent. To the extent Zertuche appears to argue that the officers had no authority to search inside the cardboard box in the master bedroom closet where 19 kilos of the cocaine was found, this argument is without merit. Zertuche's consent was not limited. *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1804 ("[t]he scope of a search is generally defined by its expressed object.... We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs"); *Stewart,* 93 F.3d at 192 (a suspect's permission for officer to "look at" a medicine bottle implied permission for the officer to "look inside" the bottle); *McSween,* 53 F.3d at 688 (failure to object to breadth of search indicates consent). Fullbright testified that he could smell the cocaine when he looked into the closet. It also appears that the box was open. Furthermore, it was reasonable for the agents to search the closets since Zertuche had told the officers that cocaine was in an unspecified closet.

### 3. *Voluntariness of Answers to Incriminating Questions.*

Zertuche argues that he was in custody and that his decision to answer the question as to whether there were weapons, money or narcotics in the residence was thus involuntary or coerced. The Court rejects this argument for the reasons discussed above as to the voluntariness of the consent to search.

In addition, this Court rejects the notion, implicit in Zertuche's argument in light of the facts found by the Court, that officers conducting an investigation may not ask for identification or ask a person's relationship to a residence or other location, may not request permission to search the location, and may not ask simple investigative questions.

Nor does the Court find it unreasonable, coercive or unconstitutional for an officer to ask questions of an individual after the officer has firmly instructed or requested that the person show that his hands are empty, prior to, in anticipation of, or in connection with continuing an interview, *if* that person has made suspicious movements during the encounter with the officers.[94]

### 4. *Timing of the Protective Sweep, the Search and Zertuche's Consent.*

Zertuche argues variously that the protective sweep and the search of the residence were unlawful because they preceded Zertuche's consent.[95] These arguments are mooted by the Court's findings of fact.

### 5. *Probable Cause.*

Zertuche argues that he was seized without probable cause. He argues that this was not a "voluntary police-citizen encounter" and that he was not free to walk away after the officers told him to come to the door with his hands raised, and that he was in custody and therefore due *Miranda* warnings at that point. He also appears to argue from this circumstance that the resulting evidence is admissible only if the officer had "reasonable and articulable suspicion to justify a *Terry*-type detention." *Id.*[96] This argument also has been addressed and rejected by the foregoing rulings.

### 6. *Conclusion*

Zertuche's motion to suppress is denied in its entirety.

### CONCLUSION

For all of the foregoing reasons, it is

**ORDERED** that **Carrera's Motion to Suppress** [Doc. # 73] is **GRANTED** as to the cocaine, Carrera's statement that the drugs were his, and the $2,060 found in the hidden

---

94. This is not the harder case presented in *Ponce,* 8 F.3d at 996–97, or *Dickerson,* 508 U.S. at 373–77, 113 S.Ct. at 2135–38.

95. These arguments are set forth in Zertuche's Memorandum, at 9–10, 16.

96. Zertuche appears to argue here that the officers had only the knowledge of his prior arrest and association with seized money as the basis for their suspicion of him. Zertuche's Memorandum, at 11. This does not comport with the facts as found by the Court.

compartment of the black Suburban. It is further

**ORDERED** that **Zertuche's Motion to Suppress** [Doc. # 59] is **DENIED** in its entirety.